[No. S004783. June 28, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
MITCHELL CARLTON SIMS, Defendant and Appellant.

COUNSEL

Leon Letwin and Richard A. Wasserstrom, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Robert F. Katz, Susan Frierson, John R. Gorey and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, J.—Following the guilt phase of a jury trial, defendant Mitchell Carlton Sims was found guilty of one count of first degree murder (Pen. Code, §§ 187, 189[1]), two counts of attempted murder (§§ 187, 664), and three counts of robbery (§ 211). The jury found that defendant used a firearm during the commission of each offense (§ 12022.5, subd. (a)) and found true two special-circumstance allegations that defendant committed the murder while lying in wait (§ 190.2, subd. (a)(15)) and during the commission of a robbery (§ 190.2, subd. (a)(17)(i)). Following the penalty phase of the trial, the jury imposed the death penalty. We affirm the judgment in its entirety.

FACTS

I. *Guilt Phase Evidence.*

A. *The prosecution's case.*

1. *The crimes.*

On December 8, 1985, in Glendale, California, defendant and codefendant Ruby Padgett[2] entered a Domino's Pizza parlor and asked Kory Spiroff, the assistant manager, for directions to a drugstore.

On the afternoon of the following day, a man and a woman entered a Sears store in Glendale and purchased a package of socks, underwear, a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Although defendant and codefendant Ruby Carolyn Padgett were charged jointly with the crimes, the trial court granted defendant's motion for severance of his trial from the trial of Padgett.

clothesline, and a knife. At the sales counter, the clerk overheard the woman admonish the man, who appeared anxious, to relax, because they would be leaving the store shortly.

On the evening of December 9, Kory Spiroff was working at the Domino's Pizza parlor with delivery drivers Edward Sicam and John Harrigan. The three men wore Domino's Pizza uniforms, consisting of short-sleeved shirts bearing a Domino's badge and a name tag above the badge. At 11:03 p.m., they received a telephone order for pizza from a male who spoke with a southern accent. The order was to be delivered to room 205 of the Regalodge Motel, located a three-minute drive from the parlor.

At 11:26 p.m., Harrigan, who was 21 years of age, left the parlor in his Toyota truck to deliver the pizza. He had sufficient money to make change for a $20 bill.

Approximately 11:45 p.m., defendant and Padgett entered the Domino's Pizza parlor. Defendant approached the front counter, pointed a gun at Sicam, and ordered Sicam and Spiroff into a back office. Spiroff warned defendant that a delivery driver was expected to return shortly. Defendant removed his sweater to reveal a Domino's Pizza shirt bearing Harrigan's name tag and chuckled, "No, I don't think so."

Defendant found a bank deposit bag, which he gave to Padgett, who began to remove the cash (approximately $2,000) from the cash drawers. Defendant told Padgett to watch for fingerprints and began wiping the tables and cash drawers.

At this point, Richard Wagner, an off-duty coworker and friend of Spiroff, arrived at the store in a truck, accompanied by his wife. After Wagner parked in front of the store and entered the premises, defendant ordered Spiroff to approach the front counter. Spiroff acknowledged the Wagners as customers, rather than acquaintances, and asked them to stand on the other side of the front counter. Mr. Wagner was puzzled and suspected a robbery was in progress.

Defendant, wearing a Domino's shirt bearing Harrigan's name tag, walked to the front counter. Mr. Wagner, impersonating a customer, ordered a pizza. Defendant told him to wait outside the store in his truck and that defendant would bring the pizza to him as soon as it was prepared. He then returned to the back office with Spiroff, where Padgett was holding Sicam at gunpoint. Padgett, commenting to defendant that he had "always wanted a watch," took Spiroff's watch from a windowsill and handed it to defendant.

When the pizza was prepared, defendant brought it to the Wagners, who were waiting outside. The Wagners then left and, proceeding to a pay telephone, called the manager of the Domino's Pizza parlor, who told them he was unaware of any employees at the establishment other than Sicam and Spiroff. The Wagners then contacted the police.

Defendant reentered the store premises, began to pace the floor, and asked Spiroff where defendant could lock up the two men. Defendant then announced he had decided to take both men one at a time into the walk-in cooler. The cooler was 8 feet by 12 feet, with a 3-tier rack against the left wall, and was maintained at a temperature between 32 and 40 degrees Fahrenheit. Defendant first forced Spiroff into the cooler, proceeding to tie his hands tightly behind his back with one end of a rope. He then looped the other end of the rope over the rack and pulled it downward, raising Spiroff's arms to a painful position behind his back, which in turn forced Spiroff to stand on his tiptoes to lessen the tension of the rope. When Spiroff complained, defendant told him, "Shut up. At least you live." Defendant then tied the end of the rope around Spiroff's neck with a knot in back of the neck, pulling the rope so tautly that—if Spiroff lowered himself from his tiptoes—the tension of the rope would cause him to strangle. When defendant asked him at what time the cooler would be opened the following day, Spiroff said that ordinarily the door would be opened at 11 a.m. Defendant stated that by that time, he and Padgett would be in San Francisco. When Spiroff asked defendant about the whereabouts of Harrigan, defendant told him that Harrigan had been tied up at the motel and would be found after Spiroff was found.

At that point, Spiroff felt extreme pain in his legs, neck, wrists, arms, and shoulders, and his hands and wrists were numb. Because of the low temperature and his stance on his tiptoes, Spiroff's calves began to tighten. But when he failed to maintain that stance, the rope tightened around his neck, beginning to strangle him.

Defendant next brought Sicam into the cooler and bound him in a similar manner. When Sicam moaned that defendant was choking him, defendant responded, "You are alive." Defendant then closed the cooler door, leaving the establishment at 12:15 a.m. with Padgett.

While standing on the toes of one foot, Spiroff attempted to knock over cartons stacked on the ground next to him so that he could stand on them and thereby alleviate the pressure of the rope around his neck. As he moved from side to side, however, the rope tightened around his neck. Eventually he was able to knock over a box so that he and Sicam could stand on it.

In response to Mr. Wagner's telephone call, Glendale police officers arrived at the Domino's Pizza parlor at 12:30 a.m. They were met by Mr. Wagner and the manager. The officers entered the establishment and, upon opening the door to the walk-in cooler, found Spiroff and Sicam. After the officers untied the ligatures, either Spiroff or Sicam told them that the person responsible for their plight was wearing Harrigan's uniform shirt and that Harrigan was last seen leaving to deliver a pizza to the Regalodge Motel.

After proceeding to the Regalodge, the officers obtained from the motel manager the key and the registration card to room 205. The room was registered under defendant's name. Upon entering the room, the officers heard the sound of running water from inside the bathroom. Opening the bathroom door, an officer found the dead body of Harrigan in the bathtub. The bathtub was full of water, and Harrigan's body was submerged under the water with his back parallel to the side of the tub. His head was located immediately under the water spout, submerged approximately one inch under the water line, with cold water running onto the back of his neck. His wrists were bound behind his back; his ankles were bound, and his feet and hands were "hogtied" together behind his back. Harrigan's head was covered with a pillowcase bound tightly around his neck with a rope. A folded washcloth had been placed inside his mouth, secured by a sock tied around his head. No money, wallet, or car keys of the decedent were found on the premises. The telephone cord inside the room had been severed.

Dr. Joseph Cogan, the forensic pathologist who performed the autopsy on Harrigan's body, determined that the cause of death was ligature strangulation. His opinion was based upon (1) the depth of the ligature furrow around the decedent's neck, indicating the extreme pressure of the ligature around the neck; and (2) the numerous hemorrhages on the inner eyelids, indicating that Harrigan was alive when the neck ligature was applied, because it obstructed the flow of blood to the head and the brain. Dr. Cogan opined that the decedent lived for no more than 10 minutes after the neck ligature was applied and that the use of this ligature was sufficient in and of itself to kill Harrigan. Dr. Cogan further testified he could not rule out drowning as a possible concurrent cause of death, based upon Harrigan's having been found fully submerged in a bathtub of water with a gag in his mouth, and the presence of frothy pulmonary edema in his trachea and bronchi.

Investigative technicians testing for fingerprints in the motel room were for the most part unsuccessful, because all surfaces appeared to have been wiped with a wet towel. One fingerprint which positively matched defendant's left thumb print was found on the inside of the cardboard toilet tissue roll. Defendant's latent fingerprint also was found inside one of the telephone books in the motel room, on the page listing pizza establishments.

The rope used as ligatures to bind Harrigan, Spiroff, and Sicam was similar to the clothesline sold to the unidentified couple at the Sears store shortly before the commission of the crimes. The knots used to tie the ligatures of Spiroff and Sicam were of the same type as was found on the ligatures on Harrigan's neck.

The prosecution introduced evidence of defendant's motive to commit the crimes. In March 1984, defendant was hired by Domino's Pizza in South Carolina. In June 1984, he enrolled in its management training program and, in January 1985, became a manager of a Domino's Pizza parlor located in West Columbia, South Carolina. Defendant resigned from Domino's on May 12, 1985. He believed that his boss, Mr. David Littman, was responsible for defendant's losing a portion of a bonus to which defendant thought he was entitled. Defendant was furious with Littman and sent his letter of resignation, complaining about Littman, to the Domino's Pizza headquarters in Michigan. Upon receiving no response to his resignation letter, defendant sought revenge, relating to his then-current girlfriend his desire to use explosives to kill Littman. Defendant also purchased a gun. On November 15, 1985, defendant was hired as a delivery driver by another Domino's Pizza establishment, located in Hanahan, South Carolina.

### 2. Defendant's arrest.

On December 25, 1985, after verifying an anonymous tip that defendant and Padgett were residing in a motel room in Las Vegas, and having been informed that defendant was believed to be armed with a handgun and a machine gun, Detective August Knudsen, accompanied by other officers of the Las Vegas Police Department, proceeded to the motel room. Defendant allowed them to enter. After defendant identified himself, he and Padgett were placed under arrest, handcuffed, and searched. Knudsen recited to defendant the *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and, without waiting for a reply, asked defendant "where the gun or guns were." Defendant replied there was a gun under the mattress of the bed. The detective lifted the mattress and found a fully loaded .25-caliber pistol.

Other items subsequently found in the motel room included ammunition, a bank deposit bag, a knife, a pair of socks, a section of a December 11, 1985, Los Angeles Times opened to an article entitled, "Delivery Man Slain While Making Run," and a page torn from the yellow pages of a Las Vegas telephone book listing pizza establishments (including the local Domino's Pizza parlors).

Harrigan's Toyota truck also was recovered in Las Vegas, approximately 20 miles from the motel. Found inside the truck was the Domino's Pizza shirt bearing Harrigan's name tag.

Defendant was taken to the Clark County jail in Las Vegas. The Las Vegas authorities did not seek to question him, but on that same day (Dec. 25) Officers Jonathan Perkins and Gary Montecuollo of the Glendale Police Department met with defendant in a jailhouse interview room. Officer Perkins informed defendant of his constitutional rights pursuant to *Miranda*. Defendant acknowledged his understanding and signed a written admonition form indicating that he did not waive his rights. As the officers stood up and prepared to leave, defendant asked the officers what was going to happen to him. In the ensuing conversation, described in detail below (pp. 437-438), defendant twice uttered "I had to kill that boy" and, thereafter, "The boy would have identified me." Officer Perkins advised defendant that because he had invoked his rights, the officers could not discuss the facts of the case with him. The officers then left the interview room.

On the following day, December 26, defendant notified the jailhouse authorities that he again wished to speak with the Glendale police officers. The officers returned to the interview room and, while waiting for defendant, Officer Perkins activated a small tape recorder that was concealed from view. When defendant arrived, he initially complained about the conditions of his confinement and then made further statements tending to incriminate himself with regard to the Glendale murder. When Officer Perkins readvised defendant of his *Miranda* rights, defendant expressly waived those rights. He then related that he had worked for Domino's Pizza in South Carolina and that he and Padgett had travelled by bus from that state to Glendale, then renting room 205 at the Regalodge Motel. Defendant further stated that they thereafter went to the Glendale Domino's Pizza and asked for directions to a drugstore, subsequently proceeding to a Sears store, where they purchased a knife, among other items. The following day they returned to the Domino's Pizza and ordered a pizza. At that point in the interview, defendant indicated he did not wish to speak further without having an attorney present, and the interview was terminated. An edited version of the tape-recorded statement was admitted into evidence and was played for the jury at the guilt phase of the proceedings.

B. *The defense case.*

Defendant did not testify. Dr. Robert Bucklin, a forensic pathologist, testified that he disagreed with the prosecution's expert testimony that indicated ligature strangulation was a cause of death. He opined that the cause of death was drowning. According to his theory, Harrigan still was alive when placed in the bathtub and, while attempting to maneuver himself, struck his head, lost consciousness, and drowned. Dr. Bucklin listed the factors supporting his conclusion, including the heavy accumulation of

watery material in the lungs and a quantity of frothy pulmonary edema in the trachea and the larnyx, which indicated the decedent had inhaled a substantial amount of water into his lungs after being placed in the bathtub. Although he did not conclude the neck ligature was the cause of death, he was of the opinion the ligature might have been a contributing cause of death by cutting off the decedent's circulation and airways.

Dr. Cogan (the forensic pathologist who had testified during the prosecution's case-in-chief) also was called by the defense and testified that the defense expert's theory as to the cause of death was a possibility.

A criminalist testified that a piece of rope tied around a person's neck, under conditions approximating those involving the ligature tied around the decedent's neck, would not cause loss of consciousness.

The defense presented was that the evidence supported the inference Harrigan was alive when placed in the bathtub and left by defendant and Padgett, and that the prosecution had failed to prove beyond a reasonable doubt that defendant had possessed the intent to kill Harrigan, Spiroff, or Sicam.

As previously noted, at the conclusion of the guilt phase of the proceedings, the jury found defendant guilty of one count of first degree murder, with two special-circumstance findings (that defendant committed the murder while lying in wait and during the commission of a robbery), two counts of attempted murder, and three counts of robbery. The jury also found that defendant used a firearm during the commission of each offense.

II. *Penalty Phase Evidence.*

A. *The prosecution's case.*

The prosecution introduced evidence that defendant robbed and murdered two Domino's Pizza employees in South Carolina less than one week prior to the commission of the crimes charged in the present case. On the evening of December 3, 1985, approximately two weeks after defendant was hired as a delivery driver at the Domino's Pizza parlor in Hanahan, South Carolina, Gary Melkie, the assistant manager, and Chris Zerr, a delivery driver, were working at the establishment. On December 4, shortly after 2 a.m., Melkie appeared in the lobby of the Hanahan Police Department, located approximately three blocks from the Domino's Pizza. Melkie, dressed in his Domino's Pizza uniform, apparently had driven a truck from the restaurant to the police station. A telephone cord was dangling from one of his wrists. He was

bleeding profusely from gunshot wounds to his head and neck and was uttering cries for help. After a paramedic was called to render aid, Melkie was placed in an ambulance and transported to the hospital. En route, the ambulance made a detour to the Domino's Pizza parlor, where another shooting had been reported. There, the police found Zerr lying on the floor covered with blood, his hands tied behind his back with a telephone cord. He died shortly thereafter from a gunshot wound to the head. The establishment's cash drawers had been emptied of approximately $1,164.

Melkie was transported to the hospital and was conscious upon arrival. While physicians attended to him in the emergency room, the paramedic asked Melkie who had shot him. Melkie responded, "Sims. Mitch Sims." Melkie related how defendant had tied up Melkie and then shot Zerr. As a police officer entered the emergency room, Melkie screamed that he was in pain. The officer asked Melkie several times whether he knew who had shot him. Melkie responded, "Mitch Sims," and described various features of defendant, including the color of his hair. The officer further inquired whether Mitch Sims had been a friend. Melkie responded that defendant worked for Domino's Pizza. Melkie later died, following surgery.

Melkie's autopsy established that he suffered four gunshot wounds to the head and neck. Three bullets were removed from his head, a bullet casing was removed from his tongue, and a fifth bullet, which had exited from his head, was recovered from a wall at the Domino's Pizza parlor.[3]

The unedited version of the tape recording of the statement made by defendant on December 26, 1985, was admitted into evidence and played for the jury. In his statement, defendant related that he had robbed a Domino's Pizza parlor in South Carolina before travelling with Padgett to California.

B. *The defense case.*

The defense presented as mitigating evidence numerous witnesses who related defendant's family background of brutal physical, sexual, and emotional abuse. Defendant's mother, Mildred, testified that she married defendant's father in 1951 when she was 15 years of age and that defendant, the youngest of their 3 children, was born when she was 24 years of age. Defendant's parents divorced when defendant was six months of age, after his father impregnated a young girl. Mildred married Arnold Cranford in

---

[3]Following the trial in the present case, defendant was tried and convicted in South Carolina of the murders of Melkie and Zerr during the commission of a robbery, and the death penalty was imposed. The convictions and sentence of death were affirmed by the Supreme Court of South Carolina. (*State* v. *Sims* (1991) 304 S.C. 409 [405 S.E.2d 377].)

1961 and remained married to him until his death in 1980. They had two children. Defendant saw his natural father on only two or three occasions during his childhood.

Defendant's stepfather Arnold had a drinking problem and became violent and sexually abusive when intoxicated. Mildred testified that when defendant was seven years of age, Arnold "raped" him. Thereafter, on numerous occasions, Arnold forced defendant to engage in oral sex with him. When defendant was 16 years of age, Arnold forced him to have sexual intercourse with his mother and, on another occasion, with his older sister Merlon. Arnold repeatedly told defendant that he (defendant) was "no good" and a bad person. Defendant began drinking heavily at the age of 14 years and attempted suicide by drowning when he was an adolescent.

Merlon testified to repeated incidents of physical and sexual abuse she and the other children had suffered at the hands of Arnold. Frequently Arnold would drag Merlon out of bed, force her to strip, and then beat her, tie her to a bed, fondle her, and occasionally have sexual intercourse with her. Following one such incident, Merlon suffered a broken nose and black eyes. After other incidents she was hospitalized. Merlon ultimately left the household but returned at 16 years of age, pregnant. One evening Arnold threatened Merlon at knifepoint that he was going "to cut that baby out of her stomach," and then sliced her breast, necessitating that she be hospitalized. Merlon attempted suicide on numerous occasions, once by a drug overdose and on another occasion by shooting herself in the chest.

When defendant was 16 years of age, Arnold came home drunk and forced defendant's younger stepsister, Margaret, to undress and lie beside him on the bed. He began to fondle her and told her he was going to have sex with her. After defendant called the police, Arnold was arrested and ultimately was convicted and placed on probation.

Defendant's wife testified concerning defendant's employment history, indicating that defendant would become withdrawn and depressed whenever he was promoted or otherwise received an advancement, and that he suffered a sense of worthlessness and guilt resulting from the incestuous act he committed with his mother. His mother, sister, and stepbrother each testified that defendant was sensitive and a good father to his three children.

A psychiatrist testified that defendant suffered chronic depression in addition to mental impairment, which resulted from alcohol and substance abuse.

A prosecutor from South Carolina testified that murder charges were pending against defendant in South Carolina and that in the event defendant

was convicted of those offenses, the prosecution would seek the death penalty.

## C. *Rebuttal.*

A South Carolina law enforcement officer testified that defendant's wife had told him that defendant, while incarcerated, had watched the video movie "The Executioner's Song" and had told her that "he was going to go out just like Gary Gilmore in a blaze of glory and not tied to a chair."

At the conclusion of the penalty phase of the proceedings, the jury fixed the punishment at death.

## DISCUSSION

### I. *Guilt Phase Issues.*

#### A. *Claim of Wheeler error.*

Following voir dire on the qualifications of the prospective jurors to serve on a capital case, the prosecutor exercised eight of his first twelve peremptory challenges to remove four Black prospective jurors—Ms. Weaver, Ms. Henry, Ms. Gaines, and Mr. Chambers—and four Hispanic-surnamed prospective jurors, leaving no Blacks and only one Hispanic-surnamed person among the prospective jurors then seated in the jury box. Defense counsel objected pursuant to *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] that the prosecutor improperly was exercising his peremptory challenges to exclude all Blacks from the jury. The prosecutor was permitted by the trial court to state his reasons for the challenges and did so, making reference to the responses of the prospective jurors during the death-qualifying voir dire.

The trial court recessed the proceedings to review the questionnaires and the transcript of the death-qualifying voir dire of the four persons in question. Upon resumption of the proceedings, the trial court permitted the prosecutor again to explain his peremptory challenges and defense counsel to respond. Defense counsel then, for the first time, raised an objection to the prosecutor's exercise of peremptory challenges to four Hispanic-surnamed persons—Mr. Mandujano, Ms. Cerda, Ms. Vasconcellos, and Mr. Estevez. The prosecutor, without prompting from the trial court, immediately offered an explanation for having removed these persons.

The trial court determined that the prosecution's reasons for peremptorily challenging the four Black prospective jurors as well as the four Hispanic-surnamed prospective jurors were not predicated on group bias and that the

prosecutor had sustained his burden of justification for removing these prospective jurors. After the trial court denied defendant's motion to dismiss the jury panel pursuant to the *Wheeler* decision, the defense raised no further *Wheeler* objection during the remainder of the voir dire proceedings.

▎██ On appeal, defendant contends the trial court erred in denying his *Wheeler* motion. As we shall explain, defendant's contention lacks merit.

██ Under the principles articulated in *Wheeler, supra,* 22 Cal.3d 258, 276-277, a party may not employ peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*Wheeler, supra,* 22 Cal.3d at p. 276; *People* v. *Fuentes* (1991) 54 Cal.3d 707, 713 [286 Cal.Rptr. 792, 818 P.2d 75]; see *Powers* v. *Ohio* (1991) 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364].) "If a party believes an opponent is improperly using peremptory challenges for a discriminatory purpose, that party must make a timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. [Citation.] To establish a prima facie case, the moving party should first make as complete a record as possible; second, the moving party must establish that the persons excluded are members of a cognizable group; and third, the moving party must show a strong likelihood that the persons are being excluded because of group association." (*Fuentes, supra,* 54 Cal.3d at p. 714.) Once the moving party has established a prima facie case, the burden shifts to the other party to come forward with a group-neutral explanation for the exercise of the challenges related to the particular case being tried. (*Wheeler, supra,* 22 Cal.3d at pp. 281-282; *Fuentes, supra,* 54 Cal.3d at p. 714.)

### 1. *Prima facie case.*

██ With respect to the prosecutor's exercise of peremptory challenges to the four Black prospective jurors, the trial court, having made no specific finding that defendant had established a prima facie showing, allowed the prosecutor to explain his exercise of peremptory challenges. We consistently have held, however, that, in general, when the trial court inquires as to the prosecutor's justifications, the court has made " 'at least an implied finding' " of a prima facie showing. (*Fuentes, supra,* 54 Cal.3d at p. 716; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1217 [255 Cal.Rptr. 569, 767 P.2d 1047].) The trial court's recess of the proceedings, following the *Wheeler* objection, for the purpose of reviewing the questionnaires and transcript of the voir dire of the four Black prospective jurors, and its subsequent statement it "would be glad" to hear again from the prosecutor regarding his

explanation for the challenges, provide a further indication of the trial court's implicit finding of a prima facie showing as to the removal of these prospective jurors.

With respect to defense counsel's *Wheeler* objection to the prosecutor's peremptory challenges of the four Hispanic-surnamed persons, the question of a prima facie showing became moot. Before the trial court made any finding as to whether a prima facie showing of group bias had been made as to the removal of these four prospective jurors, the prosecutor immediately offered justifications for his peremptory challenges, and the trial court considered those justifications before denying the *Wheeler* motion. Because the trial court had no occasion to make a finding on the threshold question, the issue on review is the adequacy of those justifications, and " 'the preliminary issue of whether the defendant had made a prima facie showing becomes moot.' " (*Fuentes, supra,* 54 Cal.3d at p. 717, citing *Hernandez* v. *New York* (1991) 500 U.S. __, __ [114 L.Ed.2d 395, 405, 111 S.Ct, 1859].)

Accordingly, we proceed to review the prosecutor's justifications for his peremptory challenges of the four Black and four Hispanic-surnamed prospective jurors, and the trial court's evaluation of those justifications.

2. *The prosecutor's justifications.*

The prosecutor offered the following justifications for his exercise of peremptory challenges to remove the eight prospective jurors in question. As to the four Black prospective jurors, the prosecutor explained that during the death-qualifying voir dire, Ms. Weaver had expressed hostility toward the death penalty, Mr. Chambers had expressed ambivalent feelings concerning the death penalty, Ms. Henry had indicated an inability to distinguish between proof beyond a reasonable doubt and proof beyond any possible doubt, and Ms. Gaines, 27 years of age, appeared too young and to lack sufficient experience in exercising responsibility. The prosecutor also maintained there was no tactical or other reason that would cause him to seek exclusion of all Blacks from the jury, stating: "We have a southern white defendant and we have white victims. Why would I not want blacks on the jury?"

As to the four Hispanic-surnamed prospective jurors, the prosecutor offered that Ms. Vasconcellos, born in Equador, had obvious difficulty communicating with counsel in English; Mr. Estevez demonstrated a cynical attitude toward the adoption of the death penalty law (the prosecutor paraphrased the juror's attitude as "the reason [Chief Justice] Rose Bird was defeated was because the people didn't have a head on a platter"); Mr.

Mandujano was a youthful college student with insufficient maturity to accept the responsibility involved in serving on a death-penalty case; and Ms. Cerda was very young and appeared immature.

As the above summary indicates, the prosecutor's stated justifications were facially race-neutral, based upon a perception of a "specific" or individual bias of each juror rather than a group bias, and thus afforded a constitutionally permissible basis for the exercise of the peremptory challenges in question. (*Wheeler, supra,* 22 Cal.3d at p. 275; see e.g., *People v. Sanders* (1990) 51 Cal.3d 471, 498 [273 Cal.Rptr. 537, 797 P.2d 561] [juror's predisposition against death penalty justified peremptory challenge]; *People v. Johnson, supra,* 47 Cal.3d 1194, 1217-1218; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659] [juror's insistence upon absolute proof in capital case justified peremptory challenge]; *People v. Henderson* (1990) 225 Cal.App.3d 1129, 1153 [275 Cal.Rptr. 837] [young people do not constitute a cognizable class for *Wheeler* purposes].)

 The record demonstrates the trial court properly performed its duty under *Wheeler* by making " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known,' " before determining that the justifications were bona fide. (*Fuentes, supra,* 54 Cal.3d at p. 718; *People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].) The record reflects the trial court reviewed the questionnaires and the transcript of the death-qualifying voir dire of the four Black prospective jurors before making its ruling. The responses of these four prospective jurors, tending to support the justifications proffered by the prosecutor, reveal that Ms. Weaver professed a religious belief that "I just don't think nobody should be able just to give anybody death"; that Mr. Chambers, when questioned whether he thought the death penalty was a good idea or a bad idea, responded, "I don't really know" and characterized it as "[p]robably a necessary evil"; that Ms. Henry indicated an inability to understand the concept of proof beyond a reasonable doubt, stating she saw "very little" difference between proof beyond a reasonable doubt and proof beyond all possible doubt, and that Ms. Gaines was 27 years of age and, as expressly noted by the trial court, her brother-in-law had robbed a store. Although Gaines's immaturity cannot be verified from the cold record, absent a showing by defendant to the contrary we must "rely on the good judgment of the trial court[]" to evaluate whether the prosecutor's reason was bona fide. (*Wheeler, supra,* 22 Cal.3d at p. 282.)

 As to the Hispanic-surnamed prospective jurors, the trial court expressly found that Mr. Mandujano "appeared quite young to the court."

Moreover, the transcript of the death-qualifying voir dire of Ms. Vasconcellos, Mr. Estevez, and Ms. Cerda supports the prosecutor's justifications for removal of these jurors. Ms. Vasconcellos appeared to have some difficulty with the English language; Mr. Estevez made a cynical remark about the death penalty law, and Ms. Cerda gave tentative, uncertain, and equivocal responses to nearly every question that was asked relating to the death penalty.

Focusing on the trial court's sole reference, in denying the *Wheeler* motion, to the prosecution's justifications relating to the four Black prospective jurors and "prospective jurors Vasconcellos, and Mandujano . . . ," omitting any reference to the justifications relating to Mr. Estevez and Ms. Cerda, defendant argues the trial court failed properly to evaluate whether these latter justifications were bona fide.

Preferably, in ruling on a *Wheeler* motion, the trial court should state expressly its determination as to the adequacy of the justification proffered with respect to each peremptory challenge. In the present case, however, where the trial court permitted argument by both the prosecution and the defense relating to the stated justifications for the challenges of Mr. Estevez and Ms. Cerda, and the record of the voir dire of these jurors amply supports those justifications, the trial court's apparent oversight reasonably cannot be construed as demonstrating a failure to exercise its responsibilities in ruling upon the *Wheeler* motion.

Defendant also maintains the age of Ms. Gaines, Mr. Mandujano, and Ms. Cerda did not justify their excusal, because the record reflects the prosecution did not challenge two young Caucasian jurors less than 30 years of age (Karlberg and Blakely). Defendant overlooks, however, the full explanation given by the prosecutor for his challenges of the three jurors—not their numerical age but rather their apparent immaturity and inexperience with assuming weighty decisions and responsibilities. Additionally, the prosecutor *did* challenge one prospective Caucasian juror because of her youth. Finally, as stated, the record of the voir dire of Ms. Cerda fully supports the justification proffered for her excusal, and the trial court expressly found that Mr. Mandujano, a college student, appeared quite young, and further found a justification unrelated to age for the challenge of Ms. Gaines. Thus, the circumstance that two youthful Caucasian jurors remained on the panel does not render discriminatory the prosecution's challenge of the three youthful, minority prospective jurors.

We conclude the record reflects a conscientious determination by the trial court that the prosecutor predicated his peremptory challenges of each of the

foregoing eight prospective jurors upon his perception of an individual bias on the part of each juror, and not on the basis of group bias. The record therefore fails to support defendant's claim of *Wheeler* error.

### B. *Lying-in-wait special-circumstance finding.*

The jury found true the special circumstance allegation that defendant committed the murder while lying in wait (§ 190.2, subd. (a)(15)). ▮▮▮ Defendant challenges this finding on three grounds, contending that this assertedly erroneous finding was prejudicial to his defense at the penalty phase of the proceedings.[4]

### 1. *Sufficiency of the evidence.*

▮ Defendant contends the evidence was insufficient to sustain the special circumstance finding. We disagree. ▮ Our prior cases establish that the factual matrix that justifies treatment of lying in wait as a special circumstance is "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage[.]" (*People* v. *Morales* (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]; see *People* v. *Edwards* (1991) 54 Cal.3d 787, 825 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from

---

[4]Prior to trial, defendant moved pursuant to section 995 to set aside the lying-in-wait special-circumstance allegation. The trial court granted the motion, concluding the evidence adduced at the preliminary hearing was insufficient to hold defendant and codefendant Padgett to answer on this allegation. The Court of Appeal subsequently granted the prosecution's petition for a writ of mandate directing reinstatement of the lying-in-wait special-circumstance allegation, concluding the circumstances of the alleged murder offense constituted "a textbook case of lying in wait." (*People* v. *Superior Court (Sims)* (1986) 185 Cal.App.3d 471, 475 [230 Cal.Rptr. 4, A.L.R.4th 2279] [*Sims*].)

Upon conclusion of the prosecution's case-in-chief, defendant unsuccessfully renewed his motion to dismiss the lying-in-wait special-circumstance allegation.

There is no merit in the Attorney General's contention that the doctrine of "law of the case" bars defendant's current challenge to the lying-in-wait special-circumstance finding. As stated, in prior proceedings the Court of Appeal determined that the evidence presented *at the preliminary hearing* was sufficient to hold defendant to answer on the lying-in-wait special circumstance allegation. (*Sims, supra*, 185 Cal.App.3d at p. 474.) At trial, by contrast, the court ruled on the adequacy of the evidence presented *during the prosecution's case-in-chief* to support that special circumstance allegation (the truth of which was to be determined by the jury), a ruling distinct from the holding of the Court of Appeal. Of course, to the extent defendant challenges the specific holding of the Court of Appeal, reconsideration of that issue indeed is barred by the law of the case. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 842 [120 Cal.Rptr. 83, 533 P.2d 211].)

view before he attacks the victim.'" (*People* v. *Webster* (1991) 54 Cal.3d 411, 448 [285 Cal.Rptr. 31, 814 P.2d 1273], citing *Morales, supra*, 48 Cal.3d at p. 555; see *People* v. *Edwards, supra*, 54 Cal.3d at p. 825.)

We agree with the Court of Appeal that the present case presents a "textbook example" of lying in wait under the foregoing definition. (See, *ante*, p. 432, fn. 4.) There was substantial evidence that defendant and Padgett purchased a clothesline and knife, then rented a motel room, telephoned the Domino's Pizza parlor, and lured Harrigan to the motel room on the pretext of ordering a pizza, concealing their true intent to rob and murder him. They waited for Harrigan in the motel room, overpowered him upon his arrival, carefully bound him with the clothesline, gagged him, and left him either dead or to drown in a bathtub full of water. Contrary to defendant's assertion, the circumstance that defendant did not conceal his presence in the motel room from Harrigan does not negate the element of concealment. (*People* v. *Edwards, supra*, 54 Cal.3d at p. 825; *People* v. *Webster, supra*, 54 Cal.3d at p. 448; *People* v. *Morales, supra*, 48 Cal.3d at p. 555 [the concealment element may manifest itself either by an ambush or by the creation of a situation in which the victim is taken unaware even though he or she knows of the murderer's presence].)

Defendant contends that although the evidence supported a finding that he and Padgett waited for Harrigan in the motel room, there was no evidence they were "watching" him during the period of waiting. Defendant maintains that mere concealment of purpose, followed by a period of waiting, is a characteristic of numerous categories of murders that are not classified as special circumstance offenses.

Again, we disagree. Although the evidence does not suggest that defendant, hidden from view, was watching Harrigan as he left the Domino's Pizza parlor and drove to the motel, there was substantial evidence that defendant, after placing the pizza order by telephone, was waiting in his motel room and was "watchful," i.e., alert and vigilant in anticipation of Harrigan's arrival so that defendant could take him by surprise. The special circumstance element of "watchful" waiting therefore was satisfied.

### 2. *Jury instruction.*

The jury was instructed in part, in accordance with former CALJIC No. 8.81.15 (1983 rev.), that the term "while lying in wait" signifies "a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of

time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. . . ." Defendant contends a reasonable juror would have understood the instruction to mean that the lying-in-wait requirement could be satisfied by a brief period of premeditation and deliberation, and that because concealment of purpose satisfied the concealment element, the instruction failed meaningfully to distinguish the special circumstance from a first degree murder perpetrated by means of lying in wait or based upon premeditation and deliberation.

We disagree. The reference to premeditation and deliberation related solely to the *duration* of the period of lying in wait and did not dispense with the other elements peculiar to the special circumstance—namely, watchful waiting and a surprise attack upon an unsuspecting victim, either by ambush or by taking the person unaware. (*People* v. *Morales, supra,* 48 Cal.3d at p. 555.) Further, the remaining portion of the jury instruction included the requirement that the killing take place *during the period of concealment and watchful waiting,* an aspect of the special circumstance distinguishable from a murder perpetrated by means of lying in wait, or following premeditation and deliberation. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1022 [254 Cal.Rptr. 586, 766 P.2d 1].) The instruction accurately sets forth the necessary elements that justify the trial court's submission of this case to the jury on a lying-in-wait special-circumstance theory rather than as simply a first degree murder case premised upon lying in wait or premeditation and deliberation.

### 3. *Constitutional challenge.*

■ In order to avoid the United States Constitution's Eighth Amendment proscription against cruel and unusual punishment, a death penalty law must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." (*Furman* v. *Georgia* (1972) 408 U.S. 238, 313 [33 L.Ed.2d 346, 392, 92 S.Ct. 2726] (conc. opn. of White, J.).) Defendant contends that the lying-in-wait special circumstance, if interpreted to apply to the facts of this case, does not provide a meaningful basis for narrowing the class of murders for which the penalty of death may be imposed. We previously have rejected the same contention, however, with respect to analogous facts and circumstances (see *People* v. *Edwards, supra,* 54 Cal.3d 787, 824; *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1023; *People* v. *Morales, supra,* 48 Cal.3d at pp. 557-558) and again conclude that the lying-in-wait special circumstance, as interpreted in this and previous decisions, has clear and specific requirements that sufficiently distinguish from other murders a murder committed while the perpetrator is lying in wait, so as to justify the classification of that type of case as one warranting imposition of the death penalty.

C. *Claim of trial court error and prosecutorial misconduct in advancing a theory as to the circumstances of Harrigan's death.*

Defendant contends the trial court erred in allowing the prosecutor to pose to the prosecution's expert witness, Dr. Cogan, a hypothetical question relating to the circumstances of Harrigan's death, specifically whether the autopsy evidence was consistent with a finding that defendant had placed the victim in the bathtub while still alive and had held the victim's head underwater until he drowned. Defendant maintains this hypothesis improperly was based upon a pretrial hearsay statement made by Padgett to the police which was neither offered nor admitted into evidence at trial, and which the trial court ruled could not form the basis of any portion of Dr. Cogan's expert testimony admitted at trial.[5] Defendant further maintains that the admission of Dr. Cogan's opinion testimony, given in response to this assertedly improper hypothetical question, constituted error, and that the prosecutor's argument based upon inferences drawn from Dr. Cogan's opinion constituted misconduct.

We review the testimony of Dr. Cogan and the prosecutorial argument that form the basis of defendant's contentions. As stated previously, Dr. Cogan testified on direct examination that following the autopsy, he formed the opinion that the victim had died of strangulation, but that he could not exclude drowning as a possible cause of death. During cross-examination of Dr. Cogan, *defense counsel* elicited testimony supporting the theory that the immediate cause of death was drowning, and that the victim had been placed in the bathtub while alive and then had lost consciousness and drowned. On redirect examination, the prosecutor, seeking to use to his advantage the evidence that drowning was the cause of death, asked Dr. Cogan whether his autopsy findings were consistent with the hypothesis that the victim was bound and placed in the bathtub while still alive, and that "some water was

[5]Following her arrest on December 25, 1985, Padgett told Officer Perkins that defendant had placed Harrigan in the bathtub while still alive and forcibly had held Harrigan's head underwater until he drowned. Following the autopsy, the prosecution provided Padgett's statement to Dr. Cogan. At trial, prior to Dr. Cogan's testimony, the trial court conducted a hearing outside the presence of the jury on the motion of defendant to exclude or limit the scope of Dr. Cogan's testimony (Evid. Code, § 402). Defense counsel argued that on the basis of the autopsy, Dr. Cogan had formed the opinion that strangulation alone was the cause of death, and then had changed his opinion to include drowning as a possible cause of death only after the prosecutor provided him with Padgett's hearsay statement. Following questioning of Dr. Cogan by the trial court and counsel, the court concluded that Dr. Cogan's proffered opinion that drowning was a possible concurrent cause of death was based upon substantial evidence independent of Padgett's hearsay statement. The trial court therefore denied the motion to exclude Dr. Cogan's testimony but ruled that any reference to Padgett's statement should be excised from his testimony. (See Evid. Code, § 803 [trial court empowered to exclude any expert testimony based in whole or in part upon improper matters].)

run into that bathtub and that his head was forcibly held under that water." Over the unsuccessful objection of defense counsel, Dr. Cogan testified that such a hypothesis was consistent with his autopsy findings. In closing argument at both the guilt and penalty phases, the prosecutor argued the following theme, over the unsuccessful objection of defense counsel: "No matter what position he was in, John Harrigan could raise his head out of that water and put his nose above the water line. And it took Mitchell Sims to hold John Harrigan's face back under the water until he died, until he stopped moving. And at all times, when John Harrigan would want to raise his head above the water, then his head would be pushed down . . . ."

 ██ ██ ██ Defendant contends the hypothetical question posed by the prosecutor to Dr. Cogan, as well as the prosecutor's closing arguments based upon that witness's response, were unsupported by any evidence.[6] He maintains that Dr. Cogan admitted on direct examination that his autopsy findings established that the cause of death was strangulation, and that the only evidence supporting Dr. Cogan's belated conclusion that drowning was a possible cause of death, and supporting the prosecutor's hypothesized scenario as to the manner in which Harrigan was killed, was the pretrial statement of Padgett, which was neither offered nor received in evidence.

Defendant's claim is devoid of merit. Our examination of the record of the *in limine* hearing preceding Dr. Cogan's testimony establishes that the trial court properly determined that Dr. Cogan's expert opinion—that drowning was a possible concurrent cause of death—was supported by adequate foundational material, independent of Padgett's hearsay statement. Defendant's claim there was insufficient evidence to support such a theory is directly contradicted by the testimony elicited by his own attorney on cross-examination of Dr. Cogan (that the autopsy results were consistent with the conclusion that the cause of death was drowning), and also is inconsistent with the defense theory, presented through the testimony of Dr. Bucklin, that the cause of death *was* drowning. Thus, contrary to defendant's assertion, the prosecutor's hypothetical scenario as to the specific manner in which the victim was killed was supported by evidence, properly received at trial, indicating that the cause of death was drowning and that the victim was

---

[6]Appellant's counsel appears to argue that a hypothetical question posed by a prosecutor to his or her expert witness, and the witness's opinion given in response to that question, must be based solely upon the evidence adduced by the prosecution during its case-in-chief on direct examination of the witness. A hypothetical question, however, may be "framed upon any theory which can be deduced" from *any* evidence properly admitted at trial, including the assumption of "any facts within the limits of the evidence," and a prosecutor may elicit an expert opinion by employing a hypothetical based upon such evidence. (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1848 at p. 1804.)

incapacitated before being placed in the bathtub with water running over his head. Accordingly, Dr. Cogan's opinion that the results of the autopsy were consistent with the prosecutor's hypothetical scenario fell within the scope of proper expert testimony. (See *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 860 [236 Cal.Rptr. 778] [an expert's opinion should be based upon facts personally observed by the expert or upon a hypothesis supported by the evidence].)

For this same reason, the prosecutor's guilt phase and penalty phase arguments to the jury based upon this opinion testimony did not constitute misconduct. Finally, the prosecutor's specific argument that defendant, rather than Padgett, held the victim's head underwater was supported by evidence establishing defendant's motive to commit the crimes and his lead role in incapacitating the two other victims at the Domino's Pizza parlor. The prosecutor's argument to the jury therefore was proper.

### D. *Claim of Miranda violation.*

Defendant contends the trial court erred in denying his motion to suppress the three incriminating statements (amounting to a confession) that he made on December 25, 1985, to Glendale Police Officers Perkins and Montecuollo at the Las Vegas jail following his arrest, and the statements (some amounting to a confession, and others to admissions) that he made on December 26, both prior to and following readvisement of his *Miranda* rights. Defendant asserts these statements improperly were elicited from him during police-initiated interrogation after he had invoked his rights pursuant to *Miranda v. Arizona, supra*, 384 U.S. 436.

The trial court's ruling admitting these statements was based upon the following evidence adduced at the hearing held on defendant's motion to suppress. Officer Perkins testified that he and Officer Montecuollo met with defendant on December 25 in a jailhouse interview room. Officer Perkins introduced himself and told defendant the officers were investigating a murder committed in Glendale, California. Officer Perkins advised defendant of his *Miranda* rights by reading them from a standard admonition form. Defendant stated he would not waive his rights and signed the admonition form so indicating.

As the officers stood up, gathered their papers, and prepared to leave, defendant asked Officer Perkins "what was going to happen from this point on" and referred to the matter of extradition. Officer Perkins explained to him that proceedings would commence for his extradition from Nevada. Defendant asked whether he would be extradited to California or to South

Carolina and said he wished to be with his family in South Carolina. Officer Perkins explained that there was a warrant for defendant's arrest in South Carolina for the murder of two Domino's Pizza employees. He further related that a warrant for defendant's arrest for the murder of a Domino's Pizza employee had been issued in California and that he intended to commence proceedings for defendant's extradition to California. Officer Perkins testified he thereafter "explained to Mr. Sims that I was from Glendale. I told him that I was present at the Regalodge in the City of Glendale on December the 10th, in which a body of a male was discovered in a room of the Regalodge, room 205, *and at this point I had reason to believe that he and a female companion occupied that room prior to the demise of Mr. John Harrigan. . . .*" (Italics added.) The officer further testified on cross-examination that he told defendant that the murder victim had delivered a pizza to that motel room. Defendant, seated and looking toward the corner of the interview room, interrupted the officer, stating, "I had to kill that boy." Surprised at the remark, Officer Perkins asked defendant a question to the effect, "What did you say?" Defendant repeated, "I had to kill that boy."

Officer Perkins continued describing the crime scene, including the condition of the victim, bound, gagged, and submerged in the bathtub, and said to defendant that the victim "did not have to die in this manner and could have been left there tied and gagged in the manner in which he was found." Defendant replied, "The boy would have identified me."

Defendant also made several comments about how he and Padgett had watched the television news coverage of the crimes prior to their arrest. Officer Perkins told defendant that because he had refused to waive his *Miranda* rights, the officers could not discuss the facts of the case with him further, and that in the event defendant wished to discuss the investigation, defendant would have to initiate further contact with them. Before the officers left, defendant asked whether he could speak with Padgett and said he wanted to have some cigarettes.

The next day, December 26, defendant advised the jailhouse authorities that he wished to speak again with the Glendale police officers. Officer Perkins, carrying a concealed tape recorder which he had activated to record the conversation, and Officer Montecuollo met with defendant in an interview room. Defendant spoke to the officers about his attempt to obtain cigarettes and his desire to communicate with Padgett. He then complained that the Nevada police perceived him as suicidal, and the following conversation ensued: "[Defendant]: . . . I'm going crazy. . . . See everyone down there . . . they think I'm going to kill myself. I've done nothing since I've

been here to make them think that but they said I'm going to anyway. [¶] [Officer Perkins]: Are you gonna, are you gonna. [¶] [Defendant]: No. [¶] [Officer Perkins]: Why. [¶] [Defendant]: Why not. I mean why should I? [¶] [Officer Perkins]: O.K., that's all I want to hear. [¶] . . . You don't seem like that kind of guy. [¶] [Defendant]: *I'm not, I'm not a murderer either but . . . .* [¶] [Officer Perkins]: What does that mean? [¶] [Defendant]: *That means that I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't of done it.*" (Italics added.)

Following this remark, Officer Perkins immediately changed the subject and returned to a discussion about obtaining cigarettes. Defendant mentioned having signed some papers relating to extradition, and a discussion ensued regarding extradition proceedings. At one point, defendant said he did not understand why he could not return to South Carolina, because there were "2 murders in South Carolina." Officer Perkins reminded defendant that the officers could not discuss the facts of the case with him because defendant had not waived his rights. The transcript of the tape recorded statement reflects that at another point defendant remarked, "You know they won't even let me see a lawyer, they have charges against me in Nevada, huh . . . lawyer." (Ellipsis in original.) Eventually, defendant indicated he desired to exonerate Padgett of any liability for the crimes committed in South Carolina. At that point, Officer Perkins displayed the previously concealed tape recorder and made a pretense of activating it for the first time. He then readvised defendant of his *Miranda* rights, including the right to have an attorney present during questioning, and to have one appointed free of charge if defendant could not afford one. Defendant expressly waived his rights. He then proceeded to admit having robbed a Domino's Pizza parlor in South Carolina and described the events preceding the commission of the crimes in the present case. Defendant related that after he and Padgett arrived in Glendale, they checked into room 205 of the Regalodge motel, purchased a knife and other items at a Sears store, and then went to the Domino's Pizza parlor to ask for directions to a drugstore. At this point in the interview, defendant indicated he would not speak further without having an attorney present. The interview thereupon terminated.

With regard to the December 25 interview, the trial court found that defendant's initial statement, "I had to kill that boy," was a spontaneous utterance and not the product of police interrogation, that the officer's request that defendant repeat the statement simply was a permissible attempt by the officer to clarify what defendant unexpectedly had uttered, and that defendant's third statement, "The boy would have identified me," also was spontaneous, voluntary, and not the product of interrogation.

The trial court concluded with regard to the December 26 interview that defendant's incriminating remarks had not been elicited in violation of *Miranda* because defendant had initiated that meeting.

■ Under the familiar requirements of *Miranda*, designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under "inherently coercive" circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent. (384 U.S. at pp. 444-445, 473-474 [16 L.Ed.2d at pp. 706-707, 722-724]; *People v. Boyer* (1989) 48 Cal.3d 247, 271 [256 Cal.Rptr. 96, 768 P.2d 610].) Once having invoked these rights, the accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 385-386, 101 S.Ct. 1880].) The initiation of further dialogue by the accused, however, does not in itself justify reinterrogation. (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044 [77 L.Ed.2d 405, 411-412, 103 S.Ct. 2830].) "[E]ven if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." (*Ibid.*)

■ Finally, interrogation (as well as reinterrogation following an invocation of rights) that requires a preceding admonition and waiver of *Miranda* rights encompasses both express questioning and its "functional equivalent." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308, 100 S.Ct. 1682].) "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . ." (446 U.S. at p. 301 [64 L.Ed.2d at p. 308], fns. omitted.)

Statements obtained in violation of *Miranda* are inadmissible to establish guilt. (*People* v. *Boyer, supra,* 48 Cal.3d at p. 271.)

We apply federal standards in reviewing defendant's claim that his December 25 and December 26 statements were elicited from him in violation of *Miranda*. (See *People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042]; *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307].)

1. *Admissibility of December 25 confession.*

■ On the basis of our independent review of the uncontradicted evidence (*People* v. *Mattson* (1990) 50 Cal.3d 826, 857 [268 Cal.Rptr. 802,

789 P.2d 983]), we conclude the record establishes that defendant's statements, "I had to kill that boy," and "The boy would have identified me," were the product of police-initiated interrogation following defendant's invocation of his *Miranda* rights.

By his offhand question as to "what was going to happen from this point on" (coupled with a reference to extradition), which he posed to the police officers as they prepared to leave, defendant did not open the door to interrogation after previously having invoked his *Miranda* rights. (See *Oregon* v. *Bradshaw, supra,* 462 U.S. at p. 1044 [77 L.Ed.2d at pp. 411-412]; *United States* v. *Montgomery* (1st Cir. 1983) 714 F.2d 201.) The United States Supreme Court's decision in *Oregon* v. *Bradshaw, supra,* 462 U.S. 1039, is instructive in this regard. In that case, following his arrest at a police station, the defendant was read the *Miranda* warnings and invoked his right to have counsel present before engaging in any further conversation with the police. En route from the police station to the jailhouse approximately 10 miles away, defendant inquired of a police officer, " 'Well, what is going to happen to me now?' " (462 U.S. at p. 1042 [77 L.Ed.2d at p. 410].) In reviewing whether defendant's subsequent confession was elicited in violation of his *Miranda* rights, the high court held that, although, under the circumstances of that case, the defendant's question had "initiated" further conversation with regard to the investigation, defendant's limited inquiry in itself *did not "suffice[ ] to show a waiver of the previously asserted right to counsel."* (*Id.,* at p. 1045 [77 L.Ed.2d at p. 412], partial italics added.) The court explained that "even if a conversation taking place after the accused has 'expressed a desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, *the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."* (*Id.,* at p. 1044 [77 L.Ed.2d at pp. 411-412], italics added.) The court in *Bradshaw* went on to conclude, however, that because in that case the police officer had warned the defendant immediately following the defendant's inquiry, " 'You do not have to talk to me . . . ,' " had reiterated the *Miranda* admonition, and had procured a waiver from the defendant before addressing him further, the prosecution had met its burden of establishing that defendant's subsequent confession was not the product of a *Miranda* violation. (*Id.,* at p. 1046 [77 L.Ed.2d at pp. 412-413].)

As with the suspect's initial question in *Bradshaw,* defendant's remark in the present case—asking the police officers what was going to happen to him with reference to extradition—cannot, in itself, properly be construed as constituting a waiver of previously invoked rights. And here, unlike the case in *Bradshaw,* the Glendale officers did not reiterate the *Miranda* admonition or procure from defendant a waiver of his rights.

Furthermore, in contrast to the defendant's remark in *Bradshaw*, in the present case, where defendant was incarcerated in Nevada after committing crimes in South Carolina and California, his initial inquiry and subsequent questions concerning extradition proceedings and whether he would be returning to South Carolina or to California did not "initiate" further conversation. Rather, defendant's remarks related simply to "routine incidents of the custodial relationship" which, as *Bradshaw* recognizes, "will not generally 'initiate' a conversation" (462 U.S. at p. 1045 [77 L.Ed.2d at p. 412]), much less justify interrogation (or its "functional equivalent"). Defendant did not refer to the crimes or indicate a desire or willingness to engage in a general discussion relating to the investigation. On cross-examination, Officer Perkins acknowledged that defendant did not ask the officers any questions concerning the investigation.[7]

Contrary to the finding of the trial court, the record establishes defendant's subsequent confessional statement ("I had to kill that boy") was not spontaneous or volunteered, but rather the product of the "functional equivalent" of interrogation. In reply to defendant's inquiry, Officer Perkins pursued a line of conversation far exceeding the scope of any answer legitimately responsive to a question concerning extradition. The record reflects that at the time he met with defendant, Officer Perkins was aware defendant already had been advised by the Nevada authorities that they were arresting him for a murder committed in Glendale. Under such circumstances, and viewed from an objective perspective, Officer Perkins's conduct in describing the motel-room crime scene, and asserting that defendant had occupied that motel room and that the victim had delivered a pizza to the room before his death, would not reasonably have been understood as simply informing defendant of the charges pending against him or of the next step in the extradition proceedings. (See *Rhode Island* v. *Innis, supra*, 446 U.S. at p. 301 [64 L.Ed.2d at p. 308] [the issue of the "functional equivalent" of interrogation focuses primarily upon the reasonable perceptions of the suspect, not the subjective intent of the government agent]; *United States* v. *Montgomery, supra*, 714 F.2d 201, 203-205.)

In *United States* v. *Montgomery, supra*, 714 F.2d 201, the defendant was found in possession of several firearms in violation of federal law. Following his arrest several months later, the defendant was given the *Miranda* warnings and invoked his rights. After being fingerprinted, he initiated the

---

[7]Defendant's inquiry relating to extradition is clearly distinguishable from the ambiguous remarks of an accused relating to—but falling short of—a clear waiver or invocation of *Miranda* rights, which justify the police in asking further questions to clarify whether the accused understands or seeks to waive his or her rights. (See, e.g., *People* v. *Carey* (1986) 183 Cal.App.3d 99, 103 [227 Cal.Rptr. 813]; *People* v. *Bestelmeyer* (1985) 166 Cal.App.3d 520, 526-527 [212 Cal.Rptr. 605].)

following conversation with a federal agent: "[¶] [Defendant]: Am I being charged with each gun? [¶] [Agent]: You will probably be charged with two counts. [¶] [Defendant]: Did all of the guns fire? [¶] [Agent]: Yes. Why do you want to know?" (714 F.2d at p. 202.) The defendant then proceeded to make further statements tending to incriminate himself which were admitted against him at trial.

On appeal following the defendant's conviction, the court reversed, holding that the admission of defendant's incriminating statements violated *Miranda*. (714 F.2d at pp. 205-206.) The court explained that although the defendant had initiated the conversation, the federal agent had extended it improperly by providing the defendant with an answer that was unresponsive to his initial inquiry: "The question asked by [defendant], 'Am I being charged with each gun?', was a natural, if not inevitable, query which would occur to one in his situation, who had been present seven months earlier when several guns had been seized. The answer ('You will probably be charged with two counts') was *unresponsive*; it obviously referred to the two qualitatively different offenses described in the indictment and conveyed no information as to the number of guns with which [defendant] was being charged. Either because of this nonresponsiveness or because [defendant] knew enough about the law to know that violation of the firearms law involved the possession of a firearm that was operable, he asked his second question ('Did all of the guns fire?')." (*Id.*, at pp. 203-204, italics added.) The court then summarized the entirety of the colloquy as establishing a violation of *Miranda*: "Here, the 'totality of circumstances' reveals: (1) a suspect who, after checking the Advice of Rights form, refused to take the last step and waive those rights until he had seen his lawyer; (2) within a short time of his asking the agent a question in an effort to understand the extent of the charges against him; (3) a nonresponsive answer by the agent; (4) a second question by the suspect apparently addressed to the same end; (5) the initiation of questioning by the agent serving no legitimate purpose, and without being preceded by any renewed warning. We have found no appellate case that, under a similar combination of circumstances, has found or upheld a finding of waiver." (*Id.*, at pp. 205-206.)

Here, defendant's questions relating to extradition were "natural, if not inevitable" in light of his having been arrested in Nevada after committing murders in two other states. The reply of Officer Perkins, focusing upon the investigation, and confronting defendant with the evidence linking him to the crimes, was nonresponsive to this inquiry and served no legitimate purpose incident to defendant's arrest or custody. Instead, the officer's conduct amounted to the application of a "technique of persuasion" viewed by United States Supreme Court decisions as likely to induce defendant to

attempt to defend—and thus incriminate—himself. (See *Rhode Island* v. *Innis, supra,* 446 U.S. at p. 299 [64 L.Ed.2d at pp. 306-307].) The use of such a technique under these circumstances thus constituted custodial interrogation. (See *In re Albert R.* (1980) 112 Cal.App.3d 783, 792 [169 Cal.Rptr. 553]; *United States* v. *Poole* (9th Cir. 1986) 794 F.2d 462, 466-467; *Combs* v. *Wingo* (6th Cir. 1972) 465 F.2d 96.)

If, after a suspect has refused to waive his or her right to have counsel present during questioning, a limited inquiry such as that made by defendant regarding extradition were deemed to open the door to interrogation, the opportunities for officers to avoid the constraint of the *Miranda* rules would be great. The present case illustrates the ease with which the bar imposed by the suspect's invocation of rights could be dissipated if that invocation is not scrupulously honored. Following defendant's confession that he "had to kill that boy," Officer Perkins challenged the merit of that statement, thereby eliciting a further incriminating response from defendant—that the victim would have identified him.

We conclude defendant's statement that he "had to kill that boy," his repetition of that statement, and his third statement that the victim would have identified him, were elicited in contravention of *Miranda*. All three statements should have been excluded from evidence. The trial court's denial of defendant's motion to suppress these statements therefore constituted error.

The three statements constituted a confession, i.e., a declaration of defendant's intentional participation in the murder. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) We shall determine the effect of the erroneous admission of these confessional statements after reviewing defendant's claims relating to the admission of his December 26 statements.

2. *Admissibility of December 26 confession and admissions.*

On the basis of the uncontradicted evidence, we conclude the record establishes that defendant's confessional statements made during his December 26 meeting with the police officers ("I'm not a murderer either . . . . I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't of done it . . . ."), and the admissions he made following readvisement of his *Miranda* rights, were not the tainted product of the December 25 confession.

Previous decisions have acknowledged that where—as a result of improper police conduct—an accused confesses, and subsequently makes

another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having " 'let the cat out of the bag by confessing.' " (See *People* v. *Johnson* (1969) 70 Cal.2d 541, 547 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366]; *People* v. *Spencer* (1967) 66 Cal.2d 158, 167 [57 Cal.Rptr. 163, 424 P.2d 715].) Notwithstanding this presumption, "no court has ever 'gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' " (*Spencer, supra*, 66 Cal.2d at p. 167, citing *United States* v. *Bayer* (1947) 331 U.S. 532, 540-541 [91 L.Ed. 1654, 1660-1661, 67 S.Ct. 1394]; see *United States* v. *Toral* (9th Cir. 1976) 536 F.2d 893, 896; *United States* v. *Knight* (2d Cir. 1968) 395 F.2d 971.) Thus, the foregoing presumption is rebuttable, with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession. (*Johnson, supra*, 70 Cal.2d at pp. 547-548; *In re Pablo C.* (1982) 129 Cal.App.3d 984, 990 [181 Cal.Rptr. 468].)

A subsequent confession is not the tainted product of the first merely because, "but for" the improper police conduct, the subsequent confession would not have been obtained. (*Johnson, supra*, 70 Cal.2d. at p. 549.) As the United States Supreme Court has explained: "[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407]; *Johnson, supra*, 70 Cal.2d at p. 548.) The degree of attenuation that suffices to dissipate the taint "requires at least an intervening independent act by the defendant or a third party" to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321]; see *People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].)

 In the present case, we conclude defendant's December 26 confessional statements, as well as his admissions made subsequent to readvisement of his *Miranda* rights, were obtained by means sufficiently attenuated from Officer Perkins's conduct of the previous day so as to be free of the taint of that impropriety. The December 25 confession was elicited by the relatively brief comments of Officer Perkins regarding the investigation and the evidence connecting defendant to the crimes, and not by a prolonged,

formal interrogation. Officer Perkins readvised defendant upon leaving him on December 25 that the officers could not and would not speak to him again unless defendant himself sought further contact. Defendant thereafter unilaterally initiated further communication the following day, specifically requesting to speak with the officers. To defendant's knowledge, the December 25 statements had not been tape-recorded or in any other way formally memorialized, and the officers did not refer or allude to defendant's December 25 confession at any time during the December 26 meeting.

Furthermore, prior to the commencement of any interrogation on December 26, defendant volunteered that he wished to exculpate Padgett with regard to the South Carolina crimes; Officer Perkins readvised defendant of his *Miranda* rights, and defendant expressly waived those rights, thereby further dissipating any taint of the improper police conduct that had occurred the preceding day. (See *Oregon* v. *Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222, 105 S.Ct. 1285].)

Defendant asserts that even if the December 26 confessional statements were not the tainted fruit of the December 25 confession, these confessional statements—made prior to the readvisement of defendant's *Miranda* rights— were elicited by the Glendale officers in violation of *Miranda*,[8] apart from the earlier *Miranda* violation.

Assuming, without deciding, however, that defendant's December 26 confessional statements—made *prior* to the readvisement of his *Miranda* rights—were elicited in violation of *Miranda*, we conclude that any error in the admission of these statements was not prejudicial. (See pt. I.D.3, *post.*)

With respect to the admissions made by defendant *following* the readvisement of his *Miranda* rights, the transcript of the tape recording establishes that a careful and thorough explanation of the *Miranda* warnings was given, and that defendant's waiver of his rights was not the tainted product of any earlier *Miranda* violation. (See *Oregon* v. *Elstad, supra,* 470 U.S. at pp. 310-311 [84 L.Ed.2d at pp. 233-234].) As explained previously, interrogation recommenced only after defendant volunteered that he wished to exculpate Padgett with regard to the South Carolina crimes.

Defendant contends his remark that the Nevada authorities had not permitted him to see an attorney required the officers to bring the interview to

---

[8]Although defendant asserts it was improper for Officer Perkins to fail to disclose prior to the interview that he was taping the conversation, and later to engage in the pretense of activating the tape recorder for the first time prior to interrogation, we conclude such conduct was not violative of any of the principles or requirements of *Miranda*. Nor was this conduct in any other way improper. (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 520 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Jackson* (1971) 19 Cal.App.3d 95, 101 [96 Cal.Rptr. 414].)

a halt, and that his subsequent waiver of *Miranda* rights therefore was ineffective. We disagree. The transcript of the tape recording reflects that defendant made an offhand remark that the Nevada authorities (who never had sought to interview or interrogate defendant) had not provided him with an attorney. The transcript clearly establishes, however, that at no point prior to engaging in further conversation with the Glendale officers did defendant indicate a desire to obtain counsel. No interrogation took place until defendant had been advised of his right to have counsel present during questioning and appointed free of charge, and until defendant expressly had waived those rights.

 3. *Effect of erroneous admission of December 25 and December 26 confessional statements.*

Prior to the decision in *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246], both the United States Supreme Court and this court held that the erroneous admission of an involuntary confession required the automatic reversal of the defendant's conviction. (See, e.g., *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844]; *People* v. *McClary, supra,* 20 Cal.3d at p. 230.) In *Fulminante,* however, the United States Supreme Court held that a federal constitutional "trial error" such as the admission of an involuntary confession does not automatically require reversal of the conviction, but is subject to the harmless-error analysis set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (499 U.S. at pp. 306-309 [113 L.Ed.2d 302 at pp. 329-331].) In *People* v. *Cahill, post,* at page 478 [20 Cal.Rptr.2d 582, 853 P.2d 1037], we reconsidered the California reversible-per-se rule (which had corresponded to the previous federal rule), concluding the erroneous admission of an involuntary confession does not require automatic reversal under the state Constitution, independently of federal law. (*Id.,* at pp. 531-541.) We recognized that when a confession has been obtained by means that render it inadmissible under the federal Constitution, the prejudicial effect of its admission in evidence must be determined under the federal *Chapman* standard of whether the error was harmless beyond a reasonable doubt. (*Id.,* at pp. 540-541.)

 Because, for the reasons set forth in *Cahill, post,* 478, the erroneous admission of an involuntary confession is not per se reversible error, *a fortiori* a confession held inadmissible by reason of having been obtained in violation of the prophylactic *Miranda* requirements also must be subject to a harmless-error standard of review.

 Under the *Chapman* standard, we conclude the admission of defendant's December 25 and December 26 confessions was not prejudicial. The

defense did not challenge the prosecution's evidence that defendant, acting in concert with Padgett, lured the victim to the motel room, then bound and gagged him, and placed him in the bathtub with the water running over his head. The sole defense offered was that defendant lacked the intent to kill the victim. The evidence of such intent, however, independent of the December 25 and December 26 confessions, was overwhelming. The victim had been hog-tied and gagged, with a pillowcase pulled over his head and secured by a ligature bound so tightly that the victim inevitably would die of strangulation if death did not occur first by drowning—the victim having been left in the bathtub with the water running over his head. On this record, we conclude beyond a reasonable doubt that the admission of the December 25 and December 26 confessional statements was harmless error.

E. *Submission of transcript to jury.*

An edited version of the December 26 tape-recorded interview was played to the jury at the guilt phase of the trial. Defendant contends the trial court erred in permitting the prosecution to provide the jury with a written transcript of the tape recording, because the transcript was not properly authenticated (Evid. Code, § 1400) as an accurate rendition of the tape recording.

Following the testimony of Officer Perkins during the prosecution's case-in-chief, the prosecutor proposed to play the tape recording to the jury. Defense counsel suggested the jury should be informed that portions of the tape recording were unintelligible. When the trial court observed that a transcript of the tape recording would be submitted to the jury, defense counsel voiced concern that the jury would follow the transcript rather than independently consider the tape recording. The trial court indicated it would listen to the tape recording and, in the event the court determined that the transcript would assist the jury in its understanding of the interview, a copy of the transcript would be provided to the jury at the time of its deliberations. Defense counsel did not object at this time that the transcript had not been authenticated and did not object on this or any other ground when the transcript was submitted to the jury at the time it commenced its deliberations. The trial court instructed the jury that in the event there was any discrepancy between the jury's understanding of the tape recording and the typed transcript, the jury's understanding of the recording should control.

Although defense counsel had the opportunity to review the transcript prior to its submission to the jury, he failed at that time to raise the objection of lack of authentication. Defendant may not raise his objection for the first time on appeal, and therefore it is deemed waived.

### F. *Admission of handgun and bank bag.*

 Defendant contends the trial court erred in denying his motion (under § 1538.5) to suppress evidence consisting of a handgun and a bank deposit bag found in the Las Vegas motel room occupied by defendant and Padgett at the time of their arrest. Defendant contends these two items were the tainted fruit of improper custodial interrogation violative of his rights under *Miranda.* We find no error.

At trial, during the *in limine* hearing on the defense motion to suppress, Officer Knudsen of the Las Vegas Police Department testified that at the time of defendant's arrest, the police had been informed that defendant was armed with a handgun and possibly a Uzi machine gun. After placing defendant and Padgett under arrest, the officers handcuffed and searched them, and Officer Knudsen advised defendant of his *Miranda* rights. Defendant acknowledged he understood his rights but did not indicate he waived those rights, and the officer did not inquire whether defendant sought to do so. Instead, the officer immediately asked defendant to tell him "where the gun or guns were." Defendant replied there was a gun under the mattress of the bed, which was located approximately two feet from where he was standing. Upon lifting the mattress, the officer discovered the gun. He then asked defendant about a Uzi machine gun, but defendant said he had no such weapon.

The police, while photographing the handgun beneath the mattress, discovered in that same location a bank deposit bag marked "Domino's."

Defendant argued the discovery of the handgun and the bank bag was the product of police interrogation violative of his rights under *Miranda,* because defendant had not waived those rights prior to the officer's inquiry concerning firearms. The trial court concluded that defendant's response to the officer's question had been obtained in violation of the requisite *Miranda* procedures and, accordingly, excluded from evidence defendant's *response* to the officer's question. With regard to the handgun itself and the bank bag, however, the court denied the motion to suppress, concluding these items were admissible under the inevitable discovery doctrine (because the police ultimately obtained a search warrant authorizing a search of the motel room) or as the fruit of a lawful search incident to defendant's arrest.

Defendant maintains that the discovery of the handgun and the bank deposit bag was not sufficiently attenuated from the taint of the asserted *Miranda* violation to justify their admission on the independent grounds relied upon by the trial court.

Contrary to the trial court, we conclude that defendant's response to the officer's question concerning the location of guns was not the product of custodial interrogation violative of *Miranda* principles, and, therefore, the discovery of the handgun and the bank bag could not be the tainted fruit of a *Miranda* violation. In *New York* v. *Quarles* (1984) 467 U.S. 649 [81 L.Ed.2d 550, 104 S.Ct. 2626], the United States Supreme Court enunciated a narrow "public safety" exception to the prophylactic procedures mandated by *Miranda*. In *Quarles*, the police, after apprehending the defendant, were confronted with the immediate necessity of ascertaining the location of a gun that they had reason to believe the defendant had discarded in a supermarket. Before reciting the *Miranda* warnings, the police asked the defendant where the gun was located, and the defendant showed them. After the police retrieved the weapon, they advised the defendant of his *Miranda* rights. Defendant claimed his statement directing the police to the gun, elicited prior to the *Miranda* warnings, was the product of custodial interrogation violative of *Miranda* and therefore inadmissible. The trial court agreed and excluded the defendant's statement directing the police to the gun, also excluding the gun itself and subsequent statements as illegal fruits of the *Miranda* violation.

On appeal, the United States Supreme Court reversed, holding that the rationale of *Miranda* does not require its application in circumstances where police officers must ask questions reasonably prompted by public safety. The court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination" (*New York* v. *Quarles, supra,* 467 U.S. at p. 657 [81 L.Ed.2d at pp. 557-558]), but held that the exception for such a situation must be circumscribed by the exigency that justifies the exception, thus authorizing the police to engage in questioning only to the extent "necessary to secure their own safety or the safety of the public . . . ." (*Id.,* at p. 659 [81 L.Ed.2d at p. 559].)

In the present case, the circumstances of defendant's arrest fall within the scope of the *Quarles* exception to the *Miranda* rule.[9] The record establishes that the Las Vegas police had been informed that a warrant for defendant's

---

[9] At trial, in opposing the defense's *in limine* motion, the prosecution did not rely upon the public safety exception to the *Miranda* requirements set forth in *Quarles*. The evidence supporting this theory was fully developed at the *in limine* hearing, however, and the defense had the opportunity to cross-examine Officer Knudsen regarding the facts pertinent to this theory. Because the record fully supports the public safety doctrine as a basis for affirming the trial court's ruling and there does not appear to be any further evidence that could have been introduced to defeat the theory, we conclude the Attorney General is not precluded from relying upon this theory in seeking to uphold the trial court's ruling. (*Green* v. *Superior Court* (1985) 40 Cal.3d 126, 138-139 [219 Cal.Rptr. 186, 707 P.2d 248].)

arrest for murder had been issued in California, that defendant was believed to be armed with one and possibly two firearms, and that defendant was considered to be extremely dangerous and to have a "death wish." At the time of defendant's arrest in the motel room, the officers therefore had reasonable grounds to suspect that firearms were present somewhere in the room, and that defendant or Padgett might struggle to gain access to the weapons in order to resist arrest or to effect an escape. Apart from whether these circumstances posed an immediate threat to the safety of the general public, they did constitute a perilous situation for the officers who were in close proximity to defendant and Padgett. Such peril justified the officers' attempt to ascertain the whereabouts of any firearms located inside the room and thus "secure their own safety," before obtaining a waiver from defendant of his *Miranda* rights. (See *New York* v. *Quarles, supra,* 467 U.S. at p. 659 [81 L.Ed.2d at p. 559].) Under *Quarles,* Officer Knudsen's inquiry did not violate the principles of *Miranda,* and defendant's response therefore was admissible.

Having learned of the possible whereabouts of a firearm located within approximately two feet of defendant, the police officers properly conducted a search incident to defendant's arrest in order to neutralize the risk posed by the presence of the weapon (see *United States* v. *Miller* (8th Cir. 1991) 946 F. 2d 1344, 1346; *People* v. *Spencer* (1972) 22 Cal.App.3d 786, 797-798 [99 Cal.Rptr. 681]; *People* v. *Arvizu* (1970) 12 Cal.App.3d 726, 729 [90 Cal.Rptr. 895]), and the discovery of the handgun and the bank bag was a product of that lawful search. The trial court did not err in admitting this evidence.

G. *Admission of videotape.*

Over defense counsel's objection, the trial court admitted into evidence a videotape of the Regalodge motel crime scene recorded by Officer Perkins. The videotape depicted the motel room, including the bathroom, the victim's body in the bathtub (with the face submerged under the water), and a deputy coroner lifting the body from the bathtub, examining the pillowcase over the head, and cutting the pillowcase to reveal the face, the gag in the mouth, and the sock covering the mouth. The trial court ruled that the videotape was admissible as relevant to the issues of malice and intent to kill, and as corroboration of the testimony of Officer Perkins and other witnesses as to the appearance of the bathroom and the victim's body. The videotape was played during the testimony of Officer Perkins, who described the matters being depicted.

Maintaining that the trial court erred in admitting the videotape, defendant contends it was more prejudicial than probative of any contested

issue at trial and was cumulative to the other photographic evidence introduced by the prosecution. (Evid. Code, § 352.)

The videotape was relevant in depicting the position of the victim's body in the tub—gagged, a pillow case secured over the head, and arms and legs bound behind the back—supporting the prosecution's theory that defendant, contrary to the defense presented at the trial, had acted with malice and the intent to kill, and that the killing was deliberate and premeditated. The videotape also corroborated Officer Perkins's testimony describing the crime scene. That the videotape was in part cumulative of other photographic evidence did not mandate its exclusion. (See *People* v. *Price* (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Defendant complains the videotape's depiction of the laborious process of removing the soaking wet body from the bathtub was irrelevant to any of the issues at the trial. The videotape, however, supported the prosecution's theory that the actions of defendant in handling the unwieldy body were laborious and therefore deliberate and purposeful. The circumstance that the body was less manageable when wet (or, as defendant asserts, after possible rigor mortis had set in) than at the time the victim was placed in the bathtub, was a matter that a reasonable juror would have recognized and considered in evaluating what was depicted in the videotape.

Thus, the videotape could have assisted the jurors in understanding and evaluating the testimony presented to them, and the trial court did not abuse its discretion in determining that this exhibit had sufficient probative value to warrant its admission. (See *People* v. *Price, supra,* 1 Cal.4th at p. 441.)

We observe, however, that in other circumstances, a videotape may present a far more graphic, gruesome, and potentially prejudicial depiction than static photographs and thus, under such circumstances, should be excluded from evidence.

### H. *Jury request for a reading back of defense closing summation.*

During its deliberations at the guilt phase of the proceedings, the jury requested a reading back of defense counsel's closing argument to the jury. The trial court denied the request, indicating to counsel that the court lacked authority to order closing summations read back to the jury, and instructing the jury that the closing remarks of counsel did not constitute evidence that could be read back to them. Maintaining that the trial court had the authority to accede to the jury's request, defendant contends the trial court's failure to do so was prejudicial error.

This contention is similar to one made by the defendant in *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1257-1260 [270 Cal.Rptr. 451, 792 P.2d 251]. In *Gordon,* as in the present case, the jury requested a reading back of the closing summation of defense counsel, and the trial court indicated it lacked authority to order counsel's summation read back and thus denied the request. In upholding the trial court's denial of the request, we concluded that section 1138, which *requires* that the trial court, upon request by the jury, read back testimony or reinstruct on legal issues, is inapplicable to a request for the reading back of closing summations. (*Id.,* at pp. 1259-1260.) We held that although the trial court had the inherent authority and discretion to order that closing argument be read back or that a transcript be furnished to the jury, under the abuse of discretion standard the trial court's refusal to do so did not constitute error. (*Id.,* at p. 1260.)

In the present case, the trial court erred in suggesting that it lacked authority to order the reading back of defense counsel's closing summation. We conclude, however, that this error was not prejudicial. The theory argued by the defense—that the evidence established defendant intended to incapacitate but not kill his three victims—was not of such complexity that its repetition was necessary in order for defendant to receive the full benefit of the adversarial process. Moreover, the disputed issue of intent to kill was fully covered by the jury instructions, written copies of which were available at the jury's request. (See § 1093, subd. (f).) Thus, it is not reasonably probable that, had the trial court read back the summation, the jury would have reached a different verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

I. *The trial court's refusal to limit the scope of defendant's cross-examination.*

Shortly prior to the completion of the defense case, defense counsel moved for a ruling barring the prosecution, in the event defendant testified, from cross-examining him regarding the murders he committed in South Carolina. In support of this motion, defense counsel urged that such cross-examination "would lighten the burden of the prosecution in . . . [defendant's] pending and subsequent capital proceeding in South Carolina."[10]

The trial court denied the motion for an advance ruling, observing that in the event defendant elected to testify, the relevance of the South Carolina

---

[10]The issue of the admissibility of evidence of the unadjudicated South Carolina crimes first arose prior to jury voir dire, when defense counsel moved for a ruling excluding any evidence relating to those offenses. Defense counsel requested the opportunity to make an in camera offer of proof of defendant's testimony, were defendant to take the stand to rebut such evidence, in order to establish the prejudicial effect of such testimony with respect to his defense of the charges pending against him in South Carolina. The trial court denied both the request for an in camera hearing and the *in limine* motion insofar as it pertained to the

killings (for impeachment purposes on cross-examination) necessarily would depend upon the content of defendant's testimony on direct examination. As an example, the court noted that were defendant, on direct examination, to give testimony contradicting that of his former girlfriend concerning his failed employment with Domino's Pizza and his desire for revenge, the evidence concerning the South Carolina crimes might well be very relevant, on cross-examination, to impeach his testimony. The court concluded by indicating it would not, at that point in the proceedings, prospectively bar cross-examination of defendant regarding subjects that might be raised, either directly or circumstantially, during his direct examination. Defendant chose not to testify.

▮ Defendant contends the trial court's refusal to bar in advance the use of evidence of the unadjudicated South Carolina crimes during his cross-examination constituted an abuse of discretion under Evidence Code section 352, because the evidence was more prejudicial than probative of any disputed issue. In support of this contention, he relies upon the trial court's ruling, pursuant to Evidence Code section 352, barring the prosecution from introducing evidence of these crimes in its case on rebuttal. (See, *ante*, pp. 453-454, fn. 10.)

The principles, and the resulting procedural rule, promulgated in *People* v. *Collins* (1986) 42 Cal.3d 378, 383-388 [228 Cal.Rptr. 899, 722 P.2d 173], govern the threshold question whether defendant's claim has been preserved for review on appeal. In *Collins*, we determined that California courts are to follow the federal rule stated in *Luce* v. *United States* (1984) 469 U.S. 38 [83 L.Ed.2d 443, 105 S.Ct. 460] (*Luce*), which requires that if a defendant wishes to preserve for appeal an objection to a trial court's *in limine* ruling permitting impeachment by a prior conviction, he or she must take the witness stand and actually suffer such impeachment. (42 Cal.3d at pp. 383-388.) We found that the reasons given by the United States Supreme Court for the procedure it had mandated were sound and equally applicable to California practice: among other matters, the trial court, in order to balance the probative value of a conviction against its prejudicial effect, " 'must know the precise nature of the defendant's testimony, which is unknowable when . . . the defendant does not testify.' " (*Id.*, at p. 384.)

admissibility of the evidence at the penalty phase. At a later point in the proceedings during the defense case, prior to the conclusion of Dr. Bucklin's testimony, the prosecutor moved for leave to introduce evidence of the South Carolina crimes during the prosecution's case on rebuttal, as probative of defendant's intent to kill (Evid. Code, § 1101, subd. (b)) and therefore relevant to negate the defense theory, presented through Dr. Bucklin's testimony, that defendant had not possessed the intent to kill. The trial court denied the prosecutor's motion, concluding that, at that point in the proceedings, the probative value of the South Carolina crimes would be far outweighed by their prejudicial effect (at the guilt phase).

Additionally, when the trial court errs in ruling the conviction admissible, the reviewing court cannot intelligently weigh the prejudicial effect of that error unless the defendant has testified. (*Ibid.*)

We conclude that our holding in *Collins, supra,* 42 Cal.3d 378, governs defendant's claim on appeal that the trial court erred in denying his *in limine* motion to bar use of the South Carolina offenses for impeachment or other purposes on cross-examination, and that, under *Collins,* his claim has not been preserved for review. The identical purpose and justification for the procedural rule adopted in *Collins* are directly applicable to the trial court's ruling in the present case: because defendant elected not to testify, the trial court had no occasion to ascertain the precise nature of defendant's testimony. Accordingly, the trial court had no basis for determining whether the probative value of the South Carolina crimes for impeachment or other purposes on cross-examination would be outweighed by their prejudicial effect, and the record is insufficient for such a determination in the present appeal.

Numerous federal court decisions similarly have applied the *Luce* rule, which we adopted in *Collins, supra,* 48 Cal.3d 378, to preclude appellate review of a trial court's refusal to bar prospective use of evidence *other than prior convictions* for impeachment of a defendant's testimony. (See, e.g., *United States* v. *Johnson* (9th Cir. 1990) 903 F.2d 1219, 1222; *United States* v. *Nivica* (1st Cir. 1989) 887 F.2d 1110, 1115-1117; *United States* v. *Griffin* (1st Cir. 1987) 818 F.2d 97, 102-105.) In *Nivica, supra,* 887 F.2d 1110, at the outset of the defense case, defense counsel informed the court of the three specific points concerning which the defendant sought to testify, and requested an advance ruling that, in the event the defendant took the stand, cross-examination would be limited to the scope of the direct examination and to questions bearing on his credibility. The district court refused to impose such a prospective limitation on cross-examination, ruling that in the event defendant testified, he would open himself to relevant cross-examination on all the issues before the jury. The defendant did not testify. On appeal, the court, citing *Luce,* held that the defendant's challenge to the trial court's ruling had not been preserved for review. The appellate court stated: "We believe that the concerns which undergird *Luce* . . . control here. Because [the defendant] did not take the stand, or ask for voir dire, his exact testimony remains, in the *Luce* phrase, 'unknowable.' [Citation.] The alleged harm is 'wholly speculative,' [citation] both because (a) the judge, in the give-and-take of live testimony, might have changed his mind and confined cross-examination more closely, and (b) on this record, we have no way of knowing the extent to which the government would have sought to cross-question [the defendant] (if at all) about other matters. Moreover, in this case

as in *Luce*, there is no reliable method for divining the genesis of defendant's decision not to testify. (Surely, self-serving statements by defense counsel are not enough to clear this hurdle.) . . . Finally, defendant's tactical choice in this case, as in *Luce*, has thwarted our ability to judge the harmfulness of the asserted error. [Citation.] In short, all of the pillars upon which *Luce* was constructed appear equally to underbrace the government's position in this instance." (887 F.2d at pp. 1116-1117.)[11]

Defendant urges that even if we conclude *Collins, supra*, 42 Cal.3d 378, precludes appellate review of a ruling such as that made in the present case, such interpretation constitutes a new rule that should be given prospective effect only. We disagree. Defendant's *in limine* motion was functionally indistinguishable from that in *Collins*, and defense counsel himself expressly recognized the relevance of *Collins* in requesting an in camera hearing in an attempt to preserve the issue for review. For these reasons, defendant was, or should have been, sufficiently apprised that the principles articulated in *Collins* were relevant and controlling with respect to the *in limine* motion and defendant's decision not to testify, so as to warrant their application to bar defendant's present claim. Defendant makes the related contention that the trial court improperly failed to consider the extent to which its ruling, subjecting him to cross-examination regarding the South Carolina offenses, would infringe upon his privilege against self-incrimination with regard to the prosecution of the charges pending against him in the South Carolina courts. Because defendant elected not to testify, however, the trial court had no occasion to consider the impact of such cross-examination on his privilege against self-incrimination, and, thus, this objection too has not been preserved for review.

In sum, because defendant elected not to testify at his trial, his objections to the trial court's *in limine* ruling may not be raised on appeal.

### J. *Jury instruction on reasonable doubt.*

■■■ By supplemental letter brief, defendant argues the jury instruction given at the guilt and penalty phases, defining reasonable doubt as that state

---

[11]Prior to jury voir dire, in seeking exclusion of evidence of the South Carolina crimes (see fn. 9, *ante*), defense counsel recognized that "[w]e have the Collins type of situation," but argued that *Collins* was not controlling. Counsel acknowledged, in requesting an in camera hearing for the purpose of making an offer of proof, the danger of preclusion of appellate review. Counsel argued, however, that, unlike *Collins*, in the present case, were defendant to make an offer of proof on the record of his prospective testimony, he would be furnishing incriminating evidence that could be used against him in the South Carolina prosecution. As we conclude, *post*, however, such forced choice was not violative of defendant's privilege against self-incrimination under either the federal or state Constitutions. (See pt. II.A.2, *post*.)

of mind in which the jurors "cannot say they feel an abiding conviction to a moral certainty of the truth of the charge," was constitutionally defective. Citing *Cage* v. *Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328], defendant maintains that "evidentiary certainty," not moral certainty, is the proper test for proof beyond a reasonable doubt. We previously have determined, however, that this standard pattern instruction (CALJIC No. 2.90 (4th ed. 1979)) properly defines the degree of proof required by the federal due process clause in a criminal case and is not inconsistent with the principles articulated by the high court in *Cage*. (*People* v. *Noguera* (1992) 4 Cal.4th 599, 633 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Jennings* (1991) 53 Cal.3d 334, 385 [279 Cal.Rptr. 780, 807 P.2d 1009].) For the reasons stated in *Noguera* and *Jennings*, we reject defendant's claim.

## II. Penalty Phase Issues

### A. *Admission of evidence of the South Carolina crimes.*

Defendant challenges on various grounds the admission of evidence of the unadjudicated South Carolina crimes.

### 1. *Admission of Melkie's dying declaration.*

Defendant contends the trial court erred in admitting the statements of Gary Melkie, identifying defendant as his assailant, pursuant to the dying declaration exception to the hearsay rule. Evidence Code section 1242 provides that "[e]vidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death." Defendant contends the evidence was insufficient to establish the preliminary foundational fact of Melkie's sense of immediately impending death.

At the hearing on the prosecution's motion (Evid. Code, § 402) to admit Melkie's statements, George Pledger testified that at the time of the events occurring on December 3, 1985 (see Facts, pt. II.A., *ante*), he was employed as a paramedic by the Hanahan Fire Department. When summoned to the lobby of the police station, he found Melkie leaning against a wall, actively bleeding from gunshot wounds, with a clotting of blood on the right side of his head. Blood was spewing from his mouth and from underneath his left eyeball and eyelid. Melkie looked at Pledger and pleaded repeatedly, "Please don't let me die," as Pledger attended to him. Pledger assured Melkie he would not let him die. Initially, Pledger could not detect Melkie's pulse. In response to Pledger's questions, Melkie identified himself, the date, and his

location, among other matters. Pledger concluded Melkie was conscious, alert, and oriented. Once in the ambulance, Pledger told Melkie he was being taken to a trauma center where he would receive the best treatment possible and assured him that he would survive. Melkie responded that Pledger's assurances were "bullshit" or that he was "full of shit"; Melkie stated: "I feel like I am going to die." Once at the trauma center, Melkie appeared to remain alert and conscious as several physicians attended to him, and he was able to answer their questions. Pledger, who had remained with Melkie, asked him what had happened. Melkie answered that he had been shot by Sims. Pledger was surprised to hear a robbery victim recognize his assailant, and repeated the question. Melkie again named "Mitch Sims." Pledger then obtained permission to bring Officer Michelle Nadeau into the emergency room so that she could speak with Melkie.

Officer Nadeau of the Hanahan Police Department testified she was known in the small community of Hanahan as the only female police officer, and was casually acquainted with Melkie. When she approached him in the emergency room, she asked whether he recognized her, and Melkie replied affirmatively. She then inquired who had shot him. Melkie responded, "Mitch Sims." The officer repeated the question several times to be certain that Melkie understood her and that she understood him. Melkie responded with defendant's name each time the question was asked. The officer did not recognize defendant's name and asked Melkie to describe the color of the hair and the clothing of the person he had named. Melkie was able to do so. He then was taken to surgery, thereafter never regained consciousness, and died.

At the conclusion of the hearing, the trial court ruled, over objection by defense counsel, that the totality of the circumstances warranted the admission of Melkie's statements as dying declarations.

The chief condition and characteristic of a "dying declaration" is the "sense of immediately impending death" (Evid. Code, § 1242), which may be shown by the declarant's own statements to that effect, or inferred from circumstances such as the declarant's physical condition, the extent of his injuries, his knowledge of his condition, and other types of statements made by the declarant. (1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, §§ 729-730, 710-712; see *People* v. *Tahl* (1967) 65 Cal.2d 719, 727 [56 Cal.Rptr. 318, 423 P.2d 246]; *People* v. *Bagwell* (1974) 38 Cal.App.3d 127, 132 [113 Cal.Rptr. 122].)

The evidence established that Melkie declared his own belief in his impending death when he stated, with reference to the paramedic's encouraging remarks, that the paramedic was "full of shit" because Melkie felt he

was going to die. That he had such a belief is further supported by the circumstance of the severity and mortal nature of his injuries—four gunshot wounds to the head and neck—and Melkie's pleas that the paramedic not let him die.

Defendant claims that Melkie's remark—"Please don't let me die"—demonstrates he was not under a sense of immediately impending death but rather had not then abandoned hope, instead believing that if properly attended, he would survive. A similar argument was made and rejected in *People* v. *Black* (1979) 96 Cal.App.3d 846 [158 Cal.Rptr. 449]. There, the wounded victim of a shooting stumbled and fell upon a nearby security guard. The victim begged the guard, " '[H]elp me, I don't want to die. I've been shot.' " (*Id.*, at p. 850.) When the guard asked the victim who had shot him, he identified the defendant. After a police officer arrived and asked the victim what had happened, the victim said, " '[P]lease don't let me die,' " and again identified the defendant as his assailant. (*Ibid.*) On appeal following his conviction, the defendant argued that the victim's statements negated a finding of a sense of impending death, instead indicating he desired medical aid and comfort. The Court of Appeal rejected the contention, observing: "At the time [the victim] made his statements in question, he was dying. Furthermore, it is apparent that [he] had knowledge of his critical condition which prompted him to plea emotionally to Officer Croul not to let him die." (*Id.*, at p. 851.)

In the present case, not only did Melkie's desperate plea that his life be saved indicate—as in *Black*—a sense of impending death, but Melkie thereafter expressly articulated his perception that death was imminent. We perceive no incompatibility between the belief of a mortally wounded victim that he is about to die and his desire to receive whatever benefit might be afforded by immediate medical treatment.

We conclude substantial evidence supports the trial court's finding of the required foundational fact of the victim's sense of impending death so as to warrant the admission of Melkie's statements as dying declarations.

 In a related argument, defendant asserts for the first time on appeal that Melkie's statements identifying defendant as the murderer of Zerr, the other South Carolina victim, improperly were admitted as dying declarations because they did not concern the circumstances of Melkie's own impending death. As we explain, however, that claim was not raised at trial and thus may not be raised on appeal.

At the conclusion of the evidentiary hearing, the trial court ruled that Melkie's statements identifying defendant as his assailant were admissible

against defendant. No issue was raised as to the admissibility of Melkie's statements identifying defendant as the murderer of Zerr, and the trial court made no ruling on this point. Thereafter, during the prosecution's presentation of its case, Pledger testified to the events that transpired in the emergency room of the trauma center, and related that he "was talking to [Melkie] about what happened and [Melkie] said that Sims had tied him up and then shot Chris [Zerr]." Because defense counsel raised no objection to this portion of Pledger's testimony, we conclude that defendant's objection to the evidence of Melkie's reference to Zerr has not been preserved for review on appeal. (Evid. Code, § 353.)

Defendant finally claims that his counsel's failure to object deprived him of his constitutional right to the effective assistance of counsel. Assuming, without deciding, that counsel's omission constituted deficient performance, such omission was nonprejudicial in light of the overwhelming evidence, independent of Melkie's remark, that defendant murdered Zerr as well as Melkie. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699-700, 104 S.Ct. 2052].) Therefore, defendant's contention must be rejected.

2. *Claimed infringement of defendant's privilege against self-incrimination.*

■ Prior to trial, defense counsel moved to strike from the prosecution's notice of aggravating circumstances all evidence relating to the alleged, unadjudicated South Carolina murders and robbery committed by defendant, on the ground the admission of this evidence would violate his privilege against self-incrimination under the federal and state Constitutions. Defendant maintained that the admission of this evidence would force him to choose between the right to defend himself at the penalty phase, and the privilege not to furnish incriminating evidence against himself for use at his then-forthcoming trial in South Carolina. He argued he would be compelled to surrender his right to testify at the penalty phase in order to preserve his state and federal constitutional privilege against self-incrimination as to the unadjudicated offenses. Defense counsel alternatively moved for the opportunity to make an in camera offer of proof of the substance of his testimony if he took the stand. The trial court denied the motions, and the prosecution presented (at the penalty phase) evidence of the unadjudicated South Carolina crimes.

The forced choice of which defendant complains was not violative of his privilege against self-incrimination under the Fifth Amendment of the federal Constitution. (*People* v. *Bonin* (1989) 47 Cal.3d 808, 852 [254 Cal.Rptr.

298, 765 P.2d 460]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1056 [251 Cal.Rptr. 757, 761 P.2d 680]; see *McGautha* v. *California* (1971) 402 U.S. 183, 213-214 [28 L.Ed.2d 711, 729-730, 91 S.Ct. 1454].) Defendant claims that article I, section 15, of the state Constitution provides greater protection against self-incrimination than does the Fifth Amendment, and that the introduction, at the penalty phase, of evidence of the South Carolina crimes violated his state constitutional privilege against self-incrimination. We already, however, have rejected this identical claim (*People* v. *Bonin, supra,* 47 Cal.3d, at pp. 852-853 [use of unadjudicated murders at penalty phase did not infringe upon the state constitutional privilege against self-incrimination]), and defendant presents no basis for our reaching a different conclusion in the present case.

### 3. *Claim of other constitutional violations.*

Defendant asserts in summary fashion that the admission of evidence of the unadjudicated crimes violated various constitutional rights under the federal and state Constitutions. We previously have rejected these identical contentions (see *People* v. *Jackson* (1989) 49 Cal.3d 1170, 1208 [264 Cal.Rptr. 852, 783 P.2d 211]; *People* v. *Malone* (1988) 47 Cal.3d 1, 48 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 200-201 [222 Cal.Rptr. 184, 711 P.2d 480]), and defendant presents no persuasive basis for us to reconsider these holdings.

### 4. *Admission of photographs.*

Over the objection of defense counsel, the trial court admitted into evidence several photographs of the crime scene at the Hanahan Domino's Pizza parlor and of the autopsies of Melkie and Zerr. The crime scene photographs depicted the bloodied body of Zerr lying on the floor, with his hands tied behind his back. The autopsy photographs depicted the gunshot entry wounds of the two victims. Defendant contends the photographs were cumulative of other evidence of the South Carolina crimes and served no purpose other than to call undue attention "to the bloody, gory nature of the crimes." Defendant contends that the photographs therefore were more prejudicial than probative of any disputed factual issue for the jury's determination, and that the trial court's ruling admitting these exhibits constituted an abuse of discretion under Evidence Code section 352.

The photographs were probative of the circumstances of the South Carolina crimes, including the prosecutor's theory as to the deliberate, calculated manner of the killings, and therefore were relevant in establishing the prosecution's case in aggravation. Our independent review of the photographs persuades us they were not unduly shocking or inflammatory. We find no abuse of discretion.

### 5. *Claim of instructional error as to the unadjudicated murders.*

The trial court instructed the jury it could consider the South Carolina killings as a circumstance in aggravation only if it was "satisfied beyond a reasonable doubt that the defendant did in fact commit" those crimes.

 Defendant contends the trial court erred in failing to instruct further that the jury unanimously must find that he committed the South Carolina crimes before any of the jurors could consider them in aggravation.

We repeatedly have rejected such a contention. (*People* v. *Gordon, supra,* 50 Cal.3d 1223, 1273; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].) In *Miranda,* we explained: "Section 190.3 provides that a jury may consider a number of factors in determining the appropriate penalty. To impose a penalty of death each juror must evaluate the evidence and then unanimously determine that the aggravating factors outweigh the mitigating factors. There is no requirement that the jury agree on *which* factors were used to reach the decision. It is therefore unnecessary that the entire jury find the prosecutor met his burden of proof on the 'other crimes' evidence before a single juror may consider this evidence." (44 Cal.3d at p. 99.) The trial court's failure to give the instruction suggested by defendant did not constitute error.

### B. *Claim of prosecutorial misconduct in penalty phase summation.*

Defendant raises several claims of prejudicial misconduct alleged to have been committed by the prosecutor during his penalty phase argument.

### 1. *Argument that the victims were progressively incapacitated.*

The prosecutor described defendant's method of killing in both the South Carolina and California episodes as involving "progressive incapacitation" of the victims, whereby defendant lulled them into a false sense that they would not be killed, so they would not resist or attempt to escape. The prosecutor told the jury there was direct evidence of such incapacitation with respect to the attempted murders of Spiroff and Sicam (defendant told them they would be found by the time defendant was in San Francisco, but then left them to die), and urged that the jury reasonably could infer that defendant had engaged in similar conduct before murdering the other victims. He argued that before killing Harrigan, defendant must have assured him that, " 'Hey, we are just going to tie you up. I mean just we are going to—just calm down. We are going to tie you up and gag you.' Incapacitated him to where he was helpless and could do nothing and couldn't resist if he

wanted to." The prosecutor later argued, with respect to the killing of Melkie and Zerr: "[W]hat Mitchell Sims did was he took two people and you can almost hear the voices calling, 'Chris, tie up Melkie. Hold the gun like this. One tie the other up or I will just tie you up. You know I am your friend. You know I am just going to take the money. All I want to have is the money.' " Defense counsel objected to this line of argument on the ground it was speculative and not supported by the evidence. The trial court overruled the objection.

 We find no misconduct. The evidence pertaining to the circumstances of the two attempted murders and the three murders committed by defendant tended to prove that in each instance defendant gradually incapacitated his victims. Defendant asked Spiroff and Sicam whether there was a place he could lock them up, and, after surveying the scene, announced he would tie up each man separately in the cooler; he then led the men into the cooler, bound them in a deliberate manner while alluding to their being found, and left them to strangle. Defendant bound and gagged Harrigan, then submerged him in a bathtub with the water running over his head. Defendant tied up Melkie and Zerr with a telephone cord before shooting them. The argument by the prosecutor that defendant had deceived his murder victims to believe he did not intend to kill them, and then murdered them, constituted a permissible inference based upon the evidence of a pattern of gradual incapacitation. We repeatedly have stated that "[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1052 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Kelly* (1990) 51 Cal.3d 931, 967 [275 Cal.Rptr. 160, 800 P.2d 516].) We find no misconduct.

2. *Argument concerning evidence presented in mitigation.*

 Defendant contends that the prosecutor committed misconduct by "urging [the jury] not to consider constitutionally relevant mitigating evidence." He refers to the prosecution's argument that the evidence of defendant's childhood history of physical, sexual, and emotional abuse, presented by the defense in mitigation, in fact had no mitigatory significance, because there was no "bridge" between defendant's family background and the crimes committed in South Carolina and California. The prosecutor urged that criminals generally have a violent childhood ("If you go up to prison and find and talk to murderers and rapists and robbers, you are not going to find a lot of Harvard M.B.A.'s. You are going to find people who in turn were abused as children. . . ."), and that there was no connection between defendant's subjugation to sexual abuse during his childhood and his deliberated crimes of murder, attempted murder, and robbery involving his prior

employer, Domino's Pizza. The prosecutor finally argued that the vile events of defendant's childhood did not constitute a mitigating factor because if "it were a mitigating factor that a person had a bad childhood, that would apply to v[i]rtually every violent felon currently incarcerated. [¶] If that were, therefore, a mitigating factor, then you would be emptying prisons because it would apply to v[i]rtually everybody."

The prosecutor's remarks, in general, fall within the bounds of proper argument. For the most part, he did not imply that the jury should disregard the evidence of defendant's background, but rather that, in relation to the nature of the crimes committed, it had no mitigating effect. "A prosecutor does not mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature." (*People* v. *Cox* (1991) 53 Cal.3d 618, 683 [280 Cal.Rptr. 692, 809 P.2d 351]; see *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1183 [259 Cal.Rptr. 701, 774 P.2d 730].) We agree that the prosecutor's comment that the troubled background of a defendant does not constitute a mitigating factor might have tended to suggest erroneously that the jury could not consider such evidence in mitigation. Any such suggestion, however, was harmless beyond a reasonable doubt. (See *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4-8 [90 L.Ed.2d 1, 6-9, 106 S.Ct. 1669]; *Chapman, supra,* 386 U.S. 18.). Because defense counsel's argument to the jury vigorously urged that defendant's background had mitigating relevance, and the trial court specifically instructed that the jury could consider as mitigating the evidence relating to defendant's prior history and childhood, there was no reasonable possibility the jury was misled to believe it could not consider defendant's background in mitigation.

### 3. *Comments on defendant's lack of remorse.*

While commenting on the "moral and sympathetic" value to be assigned by the jury to the circumstances in aggravation and mitigation, the prosecutor observed that defendant had not demonstrated any remorse for his crimes. In this regard, the prosecutor stated: "And I was waiting for those pieces of evidence to hear that Mitchell Sims was sorry. I was waiting to hear that Mitchell Sims felt bad about the years he had stolen. I was waiting for Mitchell Sims to express remorse, to apologize to somebody for what he had done and what he had taken. [¶] What I heard was [at the time of defendant's arrest] a preoccupation with getting cigarettes, seeing his girlfriend Ruby Padgett. I did not hear any of that remorse." The prosecutor also urged the jury to listen to defendant's voice, in the tape-recorded December 26 statement, reflecting an absence of feeling of guilt or remorse.

 Defendant contends that, in making these remarks, the prosecutor improperly pressed the argument that the death penalty was warranted because of defendant's lack of remorse.

Defense counsel raised no objection to this argument. Therefore, his claim on appeal is deemed waived. (*People* v. *Mitcham, supra,* 1 Cal.4th 1027, 1052.)

Moreover, we find no misconduct. Although a defendant's lack of remorse may not be considered by the jury as a factor in aggravation, defendant's prosecutor did not describe the absence of remorse as an aggravating factor. (Cf. *People* v. *Keenan* (1988) 46 Cal.3d 478, 508-509 [250 Cal.Rptr. 550, 758 P.2d 1081].) Rather, in discussing the moral and sympathetic weight to be accorded the aggravating and mitigating circumstances, the prosecutor simply suggested that the evidence of defendant's remorselessness should weigh against the jurors's assigning significance to the mitigatory evidence. We previously have held that inasmuch as "remorse is universally deemed a factor relevant to penalty" (*People* v. *Keenan, supra,* 46 Cal.3d at p. 510), it is proper for a prosecutor to comment on the absence of remorse as a mitigating factor. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 770-771 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].)

C. *Miscellaneous claims.*

Defendant asserts various claims that the 1978 death penalty law is unconstitutional and otherwise defective in several respects. We previously have rejected identical contentions (see, e.g., *People* v. *Cox, supra,* 53 Cal.3d 618, 674, 692 [inapplicable sentencing factors need not be identified and deleted from the jury instructions; no requirement that written findings be made as to the factors in aggravation relied upon by the jury, or that the jury be unanimous in its findings as to those factors]; *People* v. *Jackson, supra,* 28 Cal.3d 264, 316 [trial court need not designate which sentencing factors are aggravating and which are mitigating]; *People* v. *Gordon, supra,* 50 Cal.3d 1223, 1273-1274 [no requirement that the factors in aggravation be proved beyond a reasonable doubt, that the jury find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, or that death is beyond a reasonable doubt the appropriate penalty]), and defendant's arguments fail to persuade us to reconsider these issues.

By supplemental letter brief, defendant attacks the constitutionality of section 190.3 to the extent it permitted the jury in its penalty determination to consider, in aggravation, factors (a) (circumstances of the capital crime),

(b) (other violent criminal activity), and (i) (defendant's age at time of crime) because, defendant argues, these factors preclude a meaningful distinction between those murders that warrant the death penalty and those that do not, in violation of the Eighth Amendment to the United States Constitution. We previously have rejected this identical argument, however. In *People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142], we determined, assuming without deciding that section 190.3 is subject to such "vagueness" concerns (see *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]), that "[b]y their express terms, factors (a), (b), and (i) . . . direct the sentencer's attention to specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on his moral culpability. Having met these standards of relevance and specificity, factors (a), (b), and (i), are not 'illusory' or otherwise impermissibly 'vague'. . . ." Thus we reject defendant's present claim.

For the same reasons, we reject defendant's claim challenging the validity of the trial court's order denying modification of the death penalty verdict (§ 190.4, subd. (e)) based upon the trial court's taking into account factors (a), (b), and (i) of section 190.3.

 Defendant challenges the order denying modification of the verdict on the additional ground it was based upon an assertedly improper standard. Defendant refers to the following statement in the court's minute order: "The court also finds that the totality of the defendant's conduct in the commission of the crimes of which he was convicted before the court display a high degree of *cruelty, callousness and viciousness.*" (Italics added.) Defendant contends the order reflects the court's improper reliance on a standard (italicized *ante*) not included in section 190.3. We disagree. The quoted portion of the minute order simply reflects the trial court's evaluation of the circumstances of the capital crime, pursuant to factor (a) of section 190.3, as demonstrating particularly cruel, callous, and vicious conduct, rather than the court's reliance on such conduct as an aggravating factor independent of section 190.3.

Defendant finally challenges the order denying modification of the verdict to the extent the order was premised upon the trial court's perceived agreement with the jury as to the finding of certain factors in aggravation. Defendant refers to the minute order's recitation that the court "finds *and agrees* with the jury" that defendant killed Melkie and Zerr, and was not acting under the influence of extreme mental or emotional disturbance. (Italics added.) Defendant maintains such reference reflects the court's misconception—unsupported by the record—that the jury had made certain

findings with respect to specific aggravating factors. We conclude, however, that such reference, considered in the context of the entirety of the order, simply reflects the trial court's agreement with the implicit finding of the jury that the prosecution had established the presence of aggravating factors that outweighed any mitigating factors, so as to warrant the penalty of death. Thus, we conclude the trial court complied with the requirements of section 190.4, subdivision (e), in denying modification of the verdict.

## DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the judgment and in the reasoning of the majority opinion, except on the points mentioned here.

## I. ALLEGED MIRANDA VIOLATIONS

A. *The December 25 Confession*

On December 25, 1985, while defendant was in custody in Las Vegas, Nevada, Glendale Police Officers Perkins and Montecuollo came to interview him at the jail. Perkins began the interview by stating that he and Montecuollo were investigating a murder committed in Glendale. Perkins then advised defendant of his rights as required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. When defendant invoked his right to counsel, the officers stood up and gathered their papers, preparing to leave. Defendant then asked "what was going to happen from this point on" and asked specifically whether he would be extradited to South Carolina (where another murder charge was pending against him) or to California. Perkins said they would attempt to extradite him to California. Perkins explained that he had been present in the Glendale motel room in which the victim had been found and that he had reason to believe that defendant and a female companion had occupied that room.

"I had to kill that boy," said defendant.

"What did you say?" asked Perkins.

"I had to kill that boy," defendant repeated.

Perkins described how the victim had been found in a bathtub bound and gagged and said the victim "did not have to die in this manner and could have been left there tied and gagged."

"The boy would have identified me," said defendant.

Perkins then terminated the interview and instructed defendant that he would have to initiate any further contact.

The controlling legal principles are not in doubt. When an accused invokes the right to counsel after a *Miranda* advisement, the police must immediately cease interrogation, which can resume in the absence of an attorney only if (1) the accused initiates the conversation, and (2) the circumstances indicate that the accused has made a knowing and intelligent waiver of the right to counsel. (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830] [hereafter *Bradshaw*]; *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] [hereafter *Edwards*].) I am persuaded that the evidence in this case establishes compliance with both requirements.

The leading case on the first requirement—that the suspect initiate the conversation—is *Bradshaw*, *supra*, 462 U.S. 1039. There, the defendant, after invoking his right to counsel, asked the police officer who was escorting him: " 'Well, what is going to happen to me now?' " (*Id.* at p. 1042 [77 L.Ed.2d at p. 410].) The lead opinion by Justice Rehnquist (for four members[1] of the United States Supreme Court) concluded that by this question the defendant had initiated a conversation because the question "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." (*Id.* at pp. 1045-1046 [71 L.Ed.2d at pp. 412-413].)

Here, defendant's question ("what [is] going to happen from this point on[?]") was almost identical to the statement in *Bradshaw* (" 'what is going to happen to me now?' "). Federal courts have found similar remarks to be sufficient to satisfy the initiation requirement. (See, e.g., *Henderson* v. *Dugger* (11th Cir. 1991) 925 F.2d 1309, 1312-1313, cert. den. __ U.S. __ [121 L.Ed.2d 554, 113 S.Ct. 621] [suspect asked "what was going to happen next"]; *U.S.* v. *Velasquez* (3d Cir. 1989) 885 F.2d 1076, 1085-1086 [" 'What is going to happen?' "].) Defendant's question was not merely a request for a drink of water or use of a telephone, which are the examples that the *Bradshaw* lead opinion gives of a "necessary inquiry arising out of the custodial relationship." (*Bradshaw*, *supra*, 462 U.S. 1039, 1045-1046 [77 L.Ed.2d 405, 412-413].) Indeed, it is doubtful that any custodial relationship existed between defendant, a prisoner in a Nevada jail, and the California police officers seeking to extradite him. A defendant's inquiries about

---

[1] Justice Powell, the fifth member of the majority, did not believe it should make a difference who initiated the conversation, provided only that the circumstances showed that the accused had made a knowing and intelligent waiver of the previously asserted right to counsel. (*Bradshaw*, *supra*, 462 U.S. 1039, 1047-1054 [77 L.Ed.2d 405, 413-416] (conc. opn. of Powell, J.).)

extradition have been held to constitute initiation. (*State* v. *Lionberg* (R.I. 1987) 533 A.2d 1172, 1177.) I conclude that defendant initiated further conversation with the officers.

To establish the second requirement—a waiver of the previously asserted right to counsel—it is not necessary that the suspect be readvised of the right or that the suspect waive it expressly. (See *U.S.* v. *Montana* (2d Cir. 1992) 958 F.2d 516, 519; *Jacobs* v. *Singletary* (11th Cir. 1992) 952 F.2d 1282, 1295; *Moore* v. *Dugger* (11th Cir. 1988) 856 F.2d 129, 134.) Rather, waiver may be implied from the totality of the surrounding circumstances. (See *North Carolina* v. *Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 292, 99 S.Ct. 1755]; *U.S.* v. *Velasquez, supra,* 885 F.2d 1076, 1087-1089.)

Here, defendant had just been advised of his rights and had asserted his right to counsel, thereby indicating he understood his interrogation rights and how to invoke them. The officers, by immediately preparing to leave, had demonstrated that they would honor the invocation. Although it was the officer, not defendant, who directed the conversation to the facts of the offense after defendant had initiated further general conversation, this is "not the crucial question" under *Bradshaw, supra,* 462 U.S. 1039. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 862, fn. 21 [268 Cal.Rptr. 802, 789 P.2d 983].) Defendant's incriminating statements were not the product of threats or promises, nor was defendant ill-treated. Under these circumstances, it is reasonable to infer that defendant made a knowing, intelligent, and voluntary waiver of his right to the presence of an attorney.

Because the trial record establishes compliance with both requirements of *Edwards, supra,* 451 U.S. 477, defendant's December 25 confession was properly received in evidence.

B. *The December 26 Statements*

On December 26, 1985, defendant asked to speak to Perkins and Montecuollo. They arrived at defendant's cell with a tape recorder concealed in an accordion file. Defendant said he wanted cigarettes and wanted to talk to Padgett. He complained that the jail authorities treated him as suicidal. Perkins asked defendant if he was going to commit suicide. Defendant said no. Perkins remarked that defendant didn't "seem like that kind of guy."

"I'm not, I'm not a murderer either," said defendant.

"What does that mean?" asked Perkins.

"That means that I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't of done it," said defendant.

After some further discussion about extradition, defendant said he wanted to exonerate Padgett. Perkins gave the *Miranda* advisement again and defendant expressly waived his interrogation rights. Perkins brought out the tape recorder and pretended to turn it on (it had been recording all along). Defendant described some of his acts preceding the Glendale crimes but again invoked his right to counsel without describing the crimes themselves.

By requesting to meet with the officers, defendant initiated a generalized conversation, thus satisfying the first requirement of *Edwards, supra,* 451 U.S. 477. Again, no threats or promises were made to defendant, nor was he mistreated. On this occasion, it was defendant who first alluded to the facts of the Glendale crimes. When asked to waive his *Miranda* rights expressly, defendant did so without hesitation. The record thus establishes that defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

The incriminating statements defendant made on December 26 were properly received in evidence.

## II. SEIZURE OF THE GUN

Las Vegas police arrested defendant and Padgett in their motel room. After handcuffing and searching defendant, the police gave defendant a *Miranda* advisement, and defendant said he understood his rights. Without asking defendant whether he waived the rights, the police asked defendant where the guns were. (The police had information that defendant was armed with a handgun and possibly also a machine gun.) Defendant said there was a gun under the mattress. The police lifted the mattress and found a handgun and a bank deposit bag.

In my view, the case is indistinguishable from *People* v. *Sully* (1991) 53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163]. As in this case, the defendant in *Sully* was advised of his interrogation rights, affirmed his understanding of those rights, and thereafter proceeded to answer questions without expressly waiving his rights. On the authority of *North Carolina* v. *Butler, supra,* 441 U.S. 369, 373 [60 L.Ed.2d 286, 292], this court held that defendant had knowingly, intelligently, and voluntarily waived his rights, and that the waiver was manifested by his conduct in responding to the officer's questions. I would make the same holding here.

The conclusion that defendant fully and effectively waived his rights makes it unnecessary to decide whether defendant's statement could be held admissible under the "public safety" exception to the *Miranda* requirements articulated in *New York* v. *Quarles* (1984) 467 U.S. 649 [81 L.Ed.2d 550, 104 S.Ct. 2626].

### III. CROSS-EXAMINATION OF DEFENDANT

During the trial, defense counsel moved for an advance ruling that if defendant testified in his own behalf during the guilt phase, the prosecution would be barred from cross-examining him about two murders committed in South Carolina. The trial court refused to make such a ruling, remarking that defendant's testimony on direct examination could conceivably make the South Carolina murders proper subjects of cross-examination. Defendant did not testify at the guilt phase. Defendant contends on this appeal that the trial court erred in failing to grant the request for an order barring cross-examination on the South Carolina crimes.

The majority concludes that defendant's claim is not preserved for review because he did not testify at the guilt phase. The majority relies upon *People v. Collins* (1986) 42 Cal.3d 378, 383 [228 Cal.Rptr. 899, 722 P.2d 173], in which this court held that to preserve for appellate review a claim of error in a trial court ruling permitting impeachment with a prior felony conviction, the defendant must testify and suffer impeachment.

The majority's reasoning is unnecessarily cumbersome. Rather than holding that the issue is not preserved for review, I would hold that the trial court did not err. Although the propriety of impeachment with a prior felony conviction often may be determined in advance of a witness's testimony, the trial court in the present case could not judge the relevance or probative value of questions about the South Carolina murders without knowing the content of defendant's testimony on direct examination. Because an advance ruling simply was not feasible, the trial court properly declined to make one.

### CONCLUSION

Finding no error or other defect warranting reversal, I concur in the affirmance of the judgment.

**MOSK, J.**—I dissent.

In *People v. Cahill, post*, at page 478 [20 Cal.Rptr.2d 582, 853 P.2d 1037], a majority of this court abrogated the well- and long-settled California rule that, in a criminal trial, the admission into evidence of what has variously been called a "coerced" or "involuntary" confession by the defendant requires automatic reversal of any ensuing judgment of conviction. In my dissenting opinion, I demonstrated that there was no reason to abandon or even reconsider that rule.

Similarly, in this matter the majority abrogate the derivative and broader rule to the effect that the "introduction of a confession obtained from a

defendant in violation of [federal] constitutional guarantees is prejudicial per se and requires reversal regardless of other evidence of guilt." (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625].) They hold that the admission of such a confession is subject to harmless-error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065] (hereafter sometimes *Chapman*). Their only support is *Cahill*. But *Cahill* is simply too slender a reed.

I turn to the case at bar. On December 25 and 26, 1985, defendant confessed to the police that he had murdered John Harrigan. The confessions were subsequently admitted at trial. Erroneously so. Each was inadmissible under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (hereafter sometimes *Miranda*), and its progeny.

Recall that in *Miranda* the United States Supreme Court laid down the following rule to implement the privilege against self-incrimination contained expressly in the Fifth Amendment and impliedly in the Fourteenth:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707].)

The phrase "custodial interrogation" is crucial. The adjective encompasses any situation in which a "person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707].) The noun "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fn. omitted.)

In *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] (hereafter sometimes *Edwards*), the United States Supreme Court formulated a rule to further the purposes of *Miranda*: "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is

not subject to further interrogation by the authorities . . . , unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485 [68 L.Ed.2d at pp. 385-387].) An accused "initiates" such dialogue when he says or does anything that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating . . . to the investigation." (*Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1045 [77 L.Ed.2d 405, 412, 103 S.Ct. 2830] (plur. opn. by Rehnquist, J.).) *Edwards* is a "bright-line, prophylactic . . . rule" "providing 'clear and unequivocal' guidelines . . . ." (*Arizona* v. *Roberson* (1988) 486 U.S. 675, 682 [100 L.Ed.2d 704, 713-714, 108 S.Ct. 2093].) As such, it applies "without qualifications or exceptions . . . ." (1 LaFave & Israel, Criminal Procedure (1991 pocket supp.) § 6.9, p. 135.)

In my view, defendant's December 25 confession to the Harrigan murder was inadmissible under *Miranda.* Officer Jonathan Perkins advised defendant of his rights pursuant to that decision. Defendant declined to waive their protection, effectively requesting the assistance of counsel. Nevertheless, he was subjected to custodial interrogation in contravention of *Miranda.* He was, of course, actually in custody. He was also interrogated. Officer Perkins must surely have recognized that his comment on the investigation into the murder and the suspected involvement of defendant and his companion Ruby Padgett would induce an incriminating response. It did: "I had to kill that boy," defendant replied; "I had to kill that boy," he repeated; "He was going to identify me," he explained.

Defendant's December 26 confession to the Harrigan murder was also inadmissible under *Miranda.*

In conformity with the *Edwards* rule, defendant, "having expressed his desire to deal with the police only through counsel, [was] not subject to further interrogation by the authorities . . . ." (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 484 [68 L.Ed.2d at pp. 385-386].)

Defendant simply did not "initiate[] further communication, exchanges, or conversations with the police" within the meaning of *Edwards.* (*Edwards* v. *Arizona, supra,* 451 U.S. at p. 485 [68 L.Ed.2d at pp. 386-387].) To be sure, he initiated the *meeting* on December 26. But he did so—as the transcript of the ensuing interrogation demonstrates—in order to get some cigarettes and to arrange to see Padgett. Certainly, he did not do or say anything that could be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating . . . *to the investigation.*" (*Oregon* v. *Bradshaw, supra,* 462 U.S. at p. 1045 [77 L.Ed.2d at p. 412] (plur. opn. by Rehnquist, J.), italics added.)

Hence, at the December 26 meeting, defendant was subjected to custodial interrogation in contravention of *Miranda*. He was, still, actually in custody. He was also interrogated. The previous day, he had confessed he was Harrigan's murderer. Now, he recanted: "I'm not a murderer . . . ." Officer Perkins must surely have recognized that his question probing defendant's denial of complicity, "What does that mean?," would induce an incriminating response. It did, *immediately*. "That means," replied defendant, "that I just got drunk, and I didn't know what the fuck I was, I know I was doing it, but I shouldn't of done it."

Under *Miranda* and its progeny, the majority's "fruit-of-the-poisonous-tree" discussion, which derives from the Fourth Amendment analysis in *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407], amounts to nothing more or less than an effort to avoid the fact that the *Edwards* rule applies "without qualifications or exceptions . . . ." (1 LaFave & Israel, Criminal Procedure, *supra*, § 6.9, p. 135.) Manifestly, it is unsuccessful.

What, then, is the consequence of the admission of defendant's *Miranda*-violative confessions? Reversal.

This result is determined by application of the rule that the introduction of *any* confession offensive to the United States Constitution is reversible per se.

The same result, however, is compelled even if—as the majority hold—harmless-error analysis under *Chapman* is attempted.

*Chapman*, it need not be emphasized, is intolerant and unforgiving of error.

As the *Chapman* court itself declared: "The California constitutional [harmless-error] rule emphasizes 'a miscarriage of justice,' but the California courts"—and the majority are in accord (see maj. opn., *ante*, at p. 447)—"have neutralized this to some extent by emphasis, and perhaps overemphasis, upon the court's view of 'overwhelming evidence.' We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy* v. *Connecticut*, 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229] [(1963)]. There we said: 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' . . . [T]his statement in *Fahy* . . . emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party. An error in admitting plainly relevant evidence which possibly

influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless. Certainly error, constitutional error, in illegally admitting highly prejudicial evidence . . . , casts on someone other than the person prejudiced by it a burden to show that it was harmless. . . . There is little, if any, difference between our statement in *Fahy* v. *Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra*, 386 U.S. at pp. 23-24 [17 L.Ed.2d at pp. 710-711], fns. omitted.)

In *Yates* v. *Evatt* (1991) 500 U.S. __ [114 L.Ed.2d 432, 111 S.Ct. 1884], and *Sullivan* v. *Louisiana* (1993) __ U.S. __ [124 L.Ed.2d 182, 113 S.Ct. 2078], the United States Supreme Court provided the following explanation:

"The *Chapman* test is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Yates* v. *Evatt, supra*, 500 U.S. at p. __ [114 L.Ed.2d at p. 448, 111 S.Ct. at p. 1892]; accord, *Sullivan* v. *Louisiana, supra*, __ U.S. at pp. __-__ [124 L.Ed.2d 182 at p. 189].) "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question . . . ." (*Yates* v. *Evatt, supra*, 500 U.S. at p. __ [114 L.Ed.2d at pp. 448-449, 111 S.Ct. at p. 1893]; accord, *Sullivan* v. *Louisiana, supra*, __ U.S. at p. __ [124 L.Ed.2d 182 at p. 189].)

The focus under *Chapman* is what the jury actually decided and whether the error may have tainted its decision. "[T]he issue . . . is whether the jury actually rested its verdict on evidence [and instructions] . . . , independently of the" error. (*Yates* v. *Evatt, supra*, 500 U.S. at p. __ [114 L.Ed.2d at p. 449, 111 S.Ct. at p. 1893].) Stated differently, the "question" is "what effect [the error] had upon the guilty verdict in the case at hand." (*Sullivan* v. *Louisiana, supra*, __ U.S. at p. __ [124 L.Ed.2d 182 at p. 189].) Or, in still other words, the "inquiry" is "whether the guilty verdict actually rendered in [the] trial was surely unattributable to the error." (*Ibid.*)

As a consequence, the focus under *Chapman* is not what a reviewing court might itself decide on a cold record. "[W]hen it does that, 'the wrong entity judges the defendant guilty.' " (*Sullivan* v. *Louisiana, supra*, __ U.S. at p. __ [124 L.Ed.2d 182 at p. 190], quoting *Rose* v. *Clark* (1986) 478 U.S. 570,

578 [92 L.Ed.2d 460, 470-471, 106 S.Ct. 3101].) By its very terms, *Chapman* precludes a court from finding harmlessness based simply "upon [its own] view of 'overwhelming evidence.'" (*Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710].)

Neither is the focus under *Chapman* what a reviewing court might conjecture the jury would have decided in the absence of the error. The "hypothetical inquiry" whether, if the jury had not been exposed to the error, it would have made the decision it did, "is inconsistent with the harmless-error standard announced in *Chapman* . . . . While such a hypothetical inquiry ensures that the State has, in fact, proved [its case] beyond a reasonable doubt, it does not ensure that it has proved [it] beyond a reasonable doubt *to the satisfaction of a jury.*" (*Yates* v. *Evatt, supra,* 500 U.S. at p. ___ [114 L.Ed.2d at p. 455, 111 S.Ct. at p. 1898], italics in original (conc. opn. of Scalia, J.); accord, *Sullivan* v. *Louisiana, supra,* ___ U.S. at p. ___ [124 L.Ed.2d 182 at p. 189].) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered . . . ." (*Sullivan* v. *Louisiana, supra,* ___ U.S. at p. ___ [124 L.Ed.2d 182 at p. 189].)

Lastly, the focus under *Chapman* is not what a reviewing court might speculate concerning "what effect the . . . error might generally be expected to have upon a reasonable jury . . . ." (*Sullivan* v. *Louisiana, supra,* ___ U.S. at p. ___ [124 L.Ed.2d 182 at p. 189].) "[M]ore [is required] than appellate speculation about a hypothetical jury's action . . . ." (*Ibid.*)

In this case, the error simply cannot be held harmless beyond a reasonable doubt under *Chapman.* In his *Miranda*-violative confessions, defendant personally declared his guilt. To be sure, other evidence was introduced to prove what he acknowledged. But that evidence did not, and could not, render his confessions "unimportant." Any assertion to the contrary blinks reality. A "confession operates as a kind of evidentiary bombshell which shatters the defense." (*People* v. *Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665].) It has an "indelible impact" "on the trier of fact . . . . If the jury believes that a defendant has admitted the crime, it doubtless will be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence in the case. Apart, perhaps, from a videotape of the crime, one would have difficulty finding evidence more damaging to a criminal defendant's plea of innocence." (*Arizona* v. *Fulminante* (1991) 499 U.S. 279, 313 [113 L.Ed.2d 302, 333, 111 S.Ct. 1246, 1266-1267] (conc. opn. of Kennedy, J.).) At trial, the prosecution itself treated defendant's confessions as crucial. I can find no reason to disagree.

In concluding to the contrary, the majority rely on what they deem "overwhelming" evidence of guilt apart from defendant's confessions. (Maj.

opn., *ante*, at p. 448.) But, as explained, *Chapman* effectively prohibits an appellate court from indulging in its own views as to the weight of the properly admitted evidence. Rather, it requires the court to concentrate on the improperly admitted evidence from the perspective of the jury. This the majority do not even attempt. Had they done so, they would have come to the conclusion that the error here, which resulted "in admitting plainly relevant evidence which possibly influenced the jury adversely to" defendant "cannot . . . be conceived of as harmless." (*Chapman* v. *California*, *supra*, 386 U.S. at pp. 23-24 [17 L.Ed.2d at pp. 710-711].)

For the foregoing reasons, I would reverse the judgment in its entirety.

Appellant's petition for a rehearing was denied September 15, 1993. Mosk, J., was of the opinion that the petition should be granted.